Argued January 7 and 8, decided February 25, rehearing denied
March 25, 1913.

## DEVLIN v. MOORE.*

(130 Pac. 35.)

**Pleading—Waiver of Plea.**

1. A plea in abatement was waived by an answer to the
merits before trial of the plea.

**Banks and Banking—Construction—Property Assigned.**

2. A savings bank which was in failing condition trans-
ferred to another bank all of its assets of every kind, including
liabilities of stockholders for unpaid subscriptions, with the
power to enforce all choses in action and·other claims the same
as the assignor could have done, had it not been placed into the
hands of a receiver. In consideration of this, assignee assumed
all of assignor's legal obligations to be paid within two years
from the assignment. The contract further provided that the
receiver should continue for two years, or until the assignor's
liabilities were paid and discharged by the assignee, for the
purpose of distributing to the assignor's creditors money so paid
by the assignee, and that the assets of the assignor should be
held by the receiver as security for the faithful performance of
the contract, subject to the assignee's right to substitute other
assets therefor, and further provided·that the officers of assignor
should execute such assignments, etc., as might be necessary
to vest full title to its assets in the assignee. Held, that the
assignee bank, upon performing its part of the contract, was
entitled to the benefits of all of the assets of the assignor of
every character, including obligations owing to it from stock-
holders and choses in action, etc.

**Banks and Banking—Claims Assigned.**

3. The contract did not assign any right of action belonging
to the assignor for damages caused by the negligence of its
directors in managing its affairs; such claim not being an asset
within the meaning of the contract.

**Banks and Banking—Joint Tort-Feasors—Joint Liability.**

4. Bank directors acting jointly in the fraudulent withdrawal
and misappropriation of notes held by the bank, for their mutual

*On the question of the care required of bank directors, see note in
15 L. R. A. 305.                                    REPORTER.

benefit, are jointly liable for the whole of such notes, with interest from the dates of their withdrawal.

### Banks and Banking—Duty.

5. A bank receiver should adjust and settle the affairs of the bank within a reasonable time, obtaining the largest possible sum for its assets.

### Banks and Banking—Sales—Amount Obtained.

6. If the amount obtained by a receiver of a bank for its securities is the highest amount possible at the time of the sale, but is not sufficient to satisfy the demand for which the securities are given, the remainder of the claim is not thereby canceled.

### Banks and Banking—Liability of Directors—Negligence.

7. The fair value of land conveyed to the receiver of an insolvent bank by a director should be credited by the receiver on the amount due from such director for fraudulently misappropriating the bank's assets, though the receiver has not yet disposed of the property, so as to determine the exact proceeds.

### Fraud—Right of Action.

8. In order to recover damages for fraudulent misrepresentations, plaintiff must have been deceived by and relied upon such representations.

### Evidence—Presumption—Conduct of Business.

9. It is strongly presumed that bank directors exercise their best judgment in conducting the affairs of the bank.

### Banks and Banking—Duties of Directors.

10. It is the duty of bank directors to exercise ordinary diligence in ascertaining the condition of its business, and reasonable control over its affairs, and they are not responsible for losses resulting from their conduct if they do so, but are responsible for losses resulting from their failure to exercise the care to avoid losses which a prudent person would have exercised under the circumstances.

### Banks and Banking—Directors—Care Required—"Ordinary Care."

11. The "ordinary care" required of bank directors in conducting the bank's affairs means that degree of care which a diligent and prudent person would exercise under similar circumstances.

**Banks and Banking—Directors—Duty—Examination of Conditions.**

12. Bank directors should, in the exercise of ordinary care, have the conditions and resources of the bank examined at reasonable intervals.

**Banks and Banking—Liability of Directors—Fraud of Officers.**

13. To make bank directors liable for the fraudulent acts of other officers, the directors must have participated therein, or be negligent in supervising the bank's affairs.

**Banks and Banking—Directors—Negligence.**

14. A bank director who discharges his duties in the manner ordinarily performed by the directors of other banks in the city cannot be held guilty of gross negligence.

**Banks and Banking—Officers—Agency for Banks.**

15. The president, cashier, and other bank employees, though also directors, are not the agents of the directors, but of the corporation.

From Multnomah: WILLIAM N. GATENS, Judge.

Statement by MR. JUSTICE BEAN.

This is a suit by Thomas C. Devlin, as receiver of the Oregon Trust & Savings Bank, to recover of the defendants on the ground that they were negligent in the discharge of their duties as directors of the bank, and that they misappropriated the property and funds of the same. The circuit court rendered a decree in favor of plaintiff and against W. Cooper Morris, Walter H. Moore, and Henry A. Moore, from which the two latter appeal, and in favor of defendants Elmer E. Lytle, Lonner O. Ralston, Leo Friede, Albert T. Smith, and W. H. Copeland, from which part of the decree plaintiff appeals.

The bank was incorporated in March, 1904, under the name of Oregon Savings Bank, which name was subsequently changed to Oregon Trust & Savings Bank. It was organized with a capital stock of $100,000 by defendants Lonner O. Ralston and W. Cooper Morris, together with J. E. Lancaster and C. L. Devins, the first three

named taking stock to the amount of $25,000 each, and
the fourth subscribing to the amount of $24,000, each de-
positing his note in the bank therefor. The bank opened
for business in the City of Portland, Oregon, about May
5, 1904. Shortly after the corporation was organized,
Devins and Lancaster entered into an agreement with
Ralston and Morris, whereby they surrendered their stock
and withdrew their notes. Starting in this manner, the
bank did a large business of general savings and commer-
cial banking, until the deposits amounted to about $2,250,-
000. The bank purchased Tacoma telephone bonds of the
par value of $400,000, and Omaha telephone bonds of the
par value of $500,000, receiving stock in the respective
companies as a bonus for like amounts. Both of the com-
panies that issued these bonds are now in the hands of a
receiver. On August 21, 1907, in a suit for that pur-
pose, Thos. C. Devlin was appointed by the court as re-
ceiver of the bank.

It is alleged in the complaint, among other things, that
immediately after the organization of the bank Lonner
O. Ralston was elected a director and chosen president
of the corporation, serving until September 15, 1905;
that W. C. Morris was elected a director and qualified
as such; that he served as cashier and secretary of the
corporation, and was engaged in the active management
of the affairs and business of the same during the entire
period from its organization until the appointment of the
receiver; that Albert T. Smith was elected a director
of the bank about May 1, 1904, resigning the 15th day
of September, 1905; that W. H. Copeland was elected a
director about the middle of November, 1904, and re-
signed about the 1st of January, 1905; that Henry A.
Moore was named as a director about the middle of Sep-
tember, 1905, and served until the 21st day of August,
1907, but never qualified as such and had no stock in
the bank; that defendant Elmer E. Lytle was elected a
director on September 15, 1905, never qualified, and did

not own any stock in the bank until the 16th of October, 1906; that Leo Friede was elected a director about the middle of September, 1905, and acted until the 21st day of August, 1907, but never qualified and owned no stock. It is further alleged that each of the directors during his respective term neglected and violated all and singular his duties and obligations, and that each was guilty of gross negligence and inattention in the discharge of his several duties and obligations, and of a reckless disregard of the interests of the corporation, its stockholders, and creditors, resulting in large losses (particularly set forth in detail), on account of loans to insolvent and irresponsible parties and misapropriations of funds and property by some of the officers of the bank. The complaint further avers that at the time plaintiff was appointed receiver, and for a long time prior thereto, and since, the corporation has been and was insolvent; that the assets of the corporation coming into the hands of the plaintiff as receiver were insufficient to discharge the debts and obligations thereof; that this suit is prosecuted in behalf of the corporation, its stockholders, and creditors; that the debts and obligations of the corporation duly filed and approved by plaintiff, amounting to about $300,000, are still unpaid; that this suit is prosecuted by order and leave of the circuit court; that no corporate records, minute book, or records of the transactions of the board of directors or stockholders of the corporation other than the ordinary account books of the bank and the stock certificate books have ever come into the possession of the receiver.

The defendants W. H. Moore, Henry A. Moore, E. E. Lytle, Leo Friede, Lonner O. Ralston, and Albert T. Smith, by way of plea in abatement, allege that plaintiff is not the real party in interest in the suit for the reason that on the 11th day of February, 1908, plaintiff, as receiver of the Oregon Trust & Savings Bank, for a valuable consideration, and pursuant to the order of the

circuit court in the suit in which plaintiff was appointed as receiver, sold, assigned, and transferred to the German American Bank, a corporation organized and existing under the laws of the State of Oregon, the demands and cause of suit set forth in the complaint; and that the German American Bank has been the sole and exclusive owner and holder of such demand or right of suit ever since that date. Thereafter defendant W. H. Copeland filed a separate, identical plea in abatement. Issue being raised by replies to the plea, the matter was tried by the court, the findings of fact and conclusions of law were made, and a decree entered in favor of plaintiff.

The evidence relating to the plea in abatement is not contained in the record. It is admitted that plaintiff was appointed as receiver of the Oregon Trust & Savings Bank, and that the bank was organized with a capital stock of $100,000. The answers of the several defendants to the merits deny any liability, negligence, or misappropriation of the funds or property of the bank, and set forth the contract made by the receiver with the German American Bank, which is admitted to have been executed, and which provided for the assignment and transfer to the German American Bank of all the assets and property of the Oregon Trust & Savings Bank, in consideration that the former would assume and pay all the legal obligations of the latter, as shown in the report of Charles B. Pfahler. This contract was authorized by an order of the circuit court which was made a part thereof, and executed February 11, 1908. The German American Bank, in conjunction with the receiver, proceeded to carry out the terms of the above contract. A large number of the claims against the Oregon Trust & Savings Bank to the amount of approximately a million dollars were adjusted by transferring telephone bonds contained among the assets of the Oregon Trust & Savings Bank, many of which have since been claimed

to be practically worthless. Some of the creditors seek
to be relieved from such contracts, and to be paid in
cash. Many of the creditors of the Oregon Trust & Sav-
ings Bank took stock in the German American Bank,
amounting to some $75,000, in lieu of their claims in
the former bank. This stock is now asserted to be value-
less. A portion of the other claims was paid with the
funds which came into the hands of the receiver from
the Oregon Trust & Savings Bank. On February 11,
1910, in order to keep the German American Bank run-
ning, and to assist in carrying the burden it had assumed
by the contract, Mr. P. L. Willis, one of its directors,
furnished and deposited in a bank in San Francisco the
sum of $200,000, to take care of the unsettled claims
against the Oregon Trust & Savings Bank. As various
claims were presented at the German American Bank for
payment, they were paid with this money furnished by
Mr. Willis, who took an assignment of such claims.

It is stated on behalf of plaintiff that all of these
claims have been taken care of or purchased in this man-
ner, except certain ones amounting to approximately
$10,000, about which there is some question. Plaintiff
contends that the claims assigned to Willis have not yet
been paid or discharged, but have only been assigned or
taken care of temporarily. The other issues and facts
of the case will be referred to as they are reached with-
out stating them at length here. The record contains
about 2,800 pages of typewritten evidence, and a large
number of voluminous exhibits.          MODIFIED.

For appellant, Thomas C. Devlin, there was a brief
with oral arguments by *Mr. Alfred E. Clark* and *Mr.
Martin L. Pipes.*

For appellants, Walter H. Moore and Henry A. Moore,
there was a brief and an oral argument by *Mr. Charles
W. Fulton.*

For respondent, Elmer E. Lytle, there was a brief and an oral argument by *Mr. John H. Hall.*

For respondent, Leo Friede, there was a brief over the names of *Messrs. Teal & Minor* and *Mr. W. A. Johnson,* with an oral argument by *Mr. Joseph N. Teal.*

For respondent, Lonner O. Ralston, there was a brief and an oral argument by *Mr. Jay Bowerman.*

For respondent, W. H. Copeland, there was a brief over the names of *Messrs. Manning & White,* with an oral argument by *Mr. Samuel White.*

For respondent, Albert T. Smith, there was a brief over the names of *Mr. Joel M. Long* and *Mr. Charles A. Johns,* with an oral argument by *Mr. Long.*

For respondent, W. Cooper Morris, there was a brief over the names of *Messrs. Sweek & Fouts.*

MR. JUSTICE BEAN delivered the opinion of the court.

The defendants unite in their contention that by virtue of the contract and the proceedings thereunder the receiver in this suit represents neither creditors nor stockholders, and that neither of these exist; that payment of all the expenses of the receivership, including the attorney's fees, was provided for by the contract; that according to the agreement the German American Bank was required to pay and discharge all the indebtedness of the Oregon Trust & Savings Bank, and the expenses and costs of the receivership suit.

Defendants submit that the following propositions are established: (1) That all of the indebtedness of the Oregon Trust & Savings Bank has been paid and discharged; (2) that there are no stockholders for the receiver to represent, as all of them surrendered their stock for cancellation, as a condition to the contract of February 11, 1908, the stock having been canceled, with the exception of that held by the defendant Copeland,

who now claims no interest in the same, directly or indirectly; (3) that all of the costs and expenses of the receivership have been provided for and are required to be paid by the German American Bank as a part of the consideration for its purchase of the assets of the Oregon Trust & Savings Bank.

1. Certain of the defendants answered to the merits after they had interposed a plea in abatement, but before the trial thereof. This constituted a waiver of the matter in abatement. *Winter* v. *Norton,* 1 Or. 42, 44 (1 Cyc. 136: 1 Pl. & Pr. 33). The other defendants do not urge the pleas in abatement upon this appeal. Therefore it is unnecessary to consider the same, except in so far as the matters therein contained, which are also set forth in the answers to the merits, affect the equities of the case. As to a defense of this character, this court in the case of *Sturgis* v. *Baker,* 43 Or. 236, 241 (72 Pac. 744, 746, said:

"The statute requiring that every action shall be prosecuted in the name of the real party in interest (Section 27, B. & C. Comp.), was enacted for the benefit of a party defendant to protect him from being again harassed for the same cause. But if not cut off from any just offset or counterclaim against the demand, and a judgment in behalf of the party suing will fully protect him when discharged, then is his concern at an end."

Much depends upon the contract entered into by the receiver and the German American Bank on February 11, 1908. We will first notice some of the provisions and the intent of this agreement. It provides for the assignment and transfer to the German American Bank of all the assets and property of the Oregon Trust & Savings Bank, the leasehold interest to the premises where the business was theretofore carried on, the bank fixtures therein, the liability of any stockholder of the bank, for any unpaid part of his subscription to the capital stock

therein, and any and all property or properties sold or conveyed by any person· or persons to the Oregon Trust & Savings Bank and to the receiver to assist in its liquidation or otherwise, it being intended to comprise ·and embrace all assets of every character and nature of the Oregon Trust & Savings Bank, or its receiver, with the right and power to enforce the collection for the benefit of the German American Bank of all choses in action and all other claims of every character and nature, with the same right and power which the Oregon Trust & Savings Bank would have had in the event that it had not gone into the hands of a receiver, in consideration of and upon the condition that the German American Bank will assume and pay all the legal obligations and liabilities of the Oregon Trust & Savings Bank (as shown in the report of Charles B. Pfahler) on or before two years from the date of such transfer, without interest. The contract further provides that the receiver shall continue for a period of two years from the date of such transfer, or until such time as the obligations and liabilities shall be fully paid or discharged by the German American Bank, for the purpose of distributing to the creditors of the Oregon Trust & Savings Bank, moneys so paid by the German American Bank, and for the distribution of bonds and securities contracted for; further, that until such obligations of the Oregon Trust & Savings Bank shall be adjusted, paid, or discharged, the assets are to be held by the receiver as security for the faithful performance of the contract subject to the right of the German American Bank to finance such assets and substitute therefor at any time other assets of like estimated value, or, in lieu thereof, canceled obligations of the Oregon Trust & Savings Bank liquidated by the German American Bank equal in amounts to the assets received. It was understood that the contracts theretofore made by certain creditors of the Oregon Trust & Savings Bank

to take certain bonds and securities in payment in whole or in part of other claims against the Oregon Trust & Savings Bank should be carried out by such creditors, and that they should accept and receive the bonds and securities contracted for by them in payment of their claims against the Oregon Trust & Savings Bank to the extent of the amount agreed upon by the creditors.

It was contemplated by the contract that the receiver should be the channel through which the proceeds of the assets of the Oregon Trust & Savings Bank should flow to whomsoever they belonged. It does not appear by the contract that the claims against the Oregon Trust & Savings Bank were released or extinguished. The contract attempted to provide a means of payment. The receiver was not authorized by the court to cancel any claims against the Oregon Trust & Savings Bank until the same should be paid or adjusted and discharged by the claimants themselves. As a condition precedent to the carrying out of the provisions of this contract, the receiver required the directors of the Oregon Trust & Savings Bank, who comprised all of the stockholders, to surrender all their stock for cancellation. The directors fully complied with this requirement, with the exception of Mr. Copeland, as heretofore stated. The contract was made not only with the sanction of the circuit court, but the court was instrumental in arranging the details. It was provided that the personnel of the board of directors of the German American Bank should be satisfactory to the court and approved by it. It was evidently the intention of all the parties to the contract that the whole scheme for adjusting the affairs of the bank should be expressed therein and carried out in execution thereof. The officers and directors of the Oregon Trust & Savings Bank were virtually parties to this contract. It provided for an assignment to the German American Bank of "the liability of any stockholder of said bank, for any unpaid

part of his subscription to the capital stock therein." It was further stipulated therein that "the duly constituted officers of the said Oregon Trust & Savings Bank shall also execute such assignments, deeds, and other writings as may be necessary to vest full title to all said assets in the German American Bank." Pursuant to the stipulation last quoted, as we understand it, the stockholders of the Oregon Trust & Savings Bank canceled and surrendered nearly all their stock to the receiver. It should be noticed that this is not a suit to set aside the contract, nor to annul any of the various settlements and adjustments of the affairs made in furtherance of the same. The two references made above as to the liability of any stockholder, and, as to the acts to be performed by the officers of the Oregon Trust & Savings Bank, are the only expressions found in the contract in regard to such liability or performance, and it would seem that this was all that was contemplated by the parties to the contract or those interested therein.

As to the liability of the directors for negligence in the conduct of the affairs of the Oregon Trust & Savings Bank, prior to the contract, if we apply to that agreement the maxim, *"Expressio unius est exclusio alterius,"* it is difficult to understand how they can be held liable to the German American Bank under the terms of the contract for a failure to successfully manage the affairs of the Oregon Trust & Savings Bank. All the parties interested in the contract have acted thereon. The officers of the Oregon Trust & Savings Bank, acting through the receiver, said to the German American Bank, in effect, that they had made a failure in carrying on the business of their bank, and that if it (the German American Bank) would assume and pay all the legal obligations and liabilities of the Oregon Trust & Savings Bank, as shown in a certain report, that all of its assets and property including the liability of any stockholder of the Ore-

gon Trust & Savings Bank for any unpaid part of his
subscription to the capital stock therein would be trans-
ferred to the German American Bank.   The latter in
effect purchased the property in its then dilapidated
condition.

2.  The execution of the contract was a step in the
settlement and adjustment of the affairs of the bank
which were very much involved.   To go back of the
contract or outside of the matters contained within its
scope, and within the contemplation of the parties, would
be to unsettle and annul the terms and conditions thereof.
Under the stipulations entered into, the German Ameri-
can Bank, upon performing its part, is entitled to the
benefit of all the property and assets of the Oregon Trust
& Savings Bank, including each and every debt of every
kind or character owing the bank, whether due from the
directors, stockholders, or any one else, either upon notes,
accounts, or implied contracts.   In so far as the funds
of the Oregon Trust & Savings Bank are concerned, the
German American bank is entitled to the same right as
the Oregon Trust & Savings Bank would have had if
the assets of the bank had not been transferred.   Other-
wise the German American Bank would not have full
compensation for paying the obligation as agreed, and
there would be a failure in carrying out the contract.
It would be inequitable to require the German American
Bank to pay the claims against the Oregon Trust &
Savings Bank, and not permit the paying bank to receive
the benefit of the assets and property of the insolvent
bank.   There can be no question but that, prior to the
contract, the Oregon Trust & Savings Bank could have
maintained an action against an officer or director of
that corporation for a misappropriation or conversion of
any of the funds.   In order to determine the rights of
the respective parties in so far as affected by the con-
tract, the same should be enforced according to the letter

and spirit thereof. If any of the defendants, in breach
of their trust as officers of the bank, have misappropri-
ated money belonging to the Oregon Trust & Savings
Bank, they are bound, and should be required to return
the same or make it good to the Oregon Trust & Savings
Bank, or to its receiver, no matter how large or how
small the amount, or by whom the stock is owned. To
illustrate: If Walter H. Moore is owing a note or an
account to the Oregon Trust & Savings Bank, or has
taken, either alone or jointly, funds or negotiable instru-
ments, and has appropriated the same to his own use,
he should be held responsible therefor. To this extent,
if there be any such liability, the receiver is authorized
to maintain this suit and marshal the assets of the in-
solvent bank.

3. We are not considering now the question of the
liability of the directors for negligence as between the
bank and the public or third parties. We do not hold that
the right to bring an action for the alleged negligence
could not be assigned, but that, according to the con-
tract of February 11, 1908, giving a fair construction
to the terms and conditions thereof, it was not the in-
tention to assign such right of action to the German
American Bank. A claim for such negligence is not an
asset of the insolvent bank within the contemplation of
the stipulation of February 11, 1908. The language of
the Supreme Court of Rhode Island in *Hayes, Receiver,*
v. *Kenyon,* 7 R. I. 136, where it was claimed that the
receiver in order to recover, should satisfy the jury that
some billholder, depositor, or other creditors, or some
stockholders, had been injured by the act of the defend-
ant, is applicable to this case. We quote therefrom as
follows:

"If, therefore, the property sought in this action is the
property of the corporation, of which the defendant has
wrongfully deprived it, we see no reason for imposing

upon the receiver, as a condition to his right to recover it, that he should prove a special injury from the wrong to some creditor or stockholder of the bank. In bringing his action the plaintiff is in the performance of a statute duty necessary to the distribution required of him by law. The only questions are: Was this the property of the bank? And has the defendant in breach of his trust as an officer of the bank wrongfully appropriated it to his own use? And, under such circumstances, will an action for money had and received lie for it, at the suit of the receiver? * * On the trial of this action, it was of no consequence who, or whether any one but the bank, would be injured by this wrongful appropriation of its property. Indeed, until the property is collected and ascertained, and the expenses of the trust paid, it could not be known who, or whether any one but the bank would suffer from this wrong, or to what extent."

In a suit against the officers and directors of a corporation by the receiver thereof to recover moneys belonging to it, which were alleged to have been wrongfully appropriated and distributed among themselves, in *McCarty's Appeal*, 110 Pa. 379, 381 (4 Atl. 925, 927) answering a contention similar to that made by defendants, the court said:

"This is truly a novel argument for the officers and directors of a dissolved corporation, who are clearly shown to have fraudulently misappropriated and distributed among themselves over $18,000 of its funds to advance when called on to make restitution. It is a sufficient answer to all this to say that they have no right to retain the money."

"Directors of a corporation are fully justified in committing the performance of the ministerial work and the details of the corporate business to subordinate agents and officers. They do not thus become insurers of the fidelity of such agents and officers, but, if they act in good faith and with reasonable care and diligence in the

appointment and supervision of such agents, they are not personally liable for losses happening either through the frauds, negligence, or crimes of such agents and officers. These agents, while selected by the directors, are not the agents of the directors, but agents of the corporation. It must be borne in mind in judging the liability of directors that they are not expected to devote their entire time to the management of the corporation, and that their custom is to commit the active management and responsibility of the corporate affairs to executive officers and subordinate agents to whom salaries are paid, and their entire time is required in the discharge of the duties; that the office of the directors being, in their character of part proprietors and mandataries, to superintend, direct, and control; and that the ground of their liability under the head of negligence and nonfeasance consists in their failure to exercise due diligence in the work of supervision and control, and the question being judged according to the circumstances of each particular case." 2 Thompson, Corporations (2 ed.) § 1280.

In Section 1295 the same author says:

"A director, even under the doctrine that he is an agent, is liable to his principal for breaches of duties he has assumed. This is denominated a liability for nonfeasance. So a liability exists for trespasses, frauds, or other wrongs which he may commit against third persons while discharging the duties of such agency. This is usually denominated a liability for misfeasance. In the latter class where the wrong was done or committed in the course of the agency, or where it was directly authorized by the principal, both principal and agent are liable either jointly or severally. Directors stand toward strangers in the same relation in which any other agents stand toward third persons. For a breach of duty to such principal, redress can only be had by that principal, the corporation, or by the shareholders where the corporation refuses to sue. If the fraud is imputable to the corporation, the person injured may have redress against the corporation and the directors for the reparation of such injury. The agent is personally liable to third persons, for his own misfeasance and positive wrongs, but he is not in general liable to third persons

for his own nonfeasances or omissions of duty, in the course of his employment. His liability in these latter cases is solely to his principal, there being no privity between him and such third persons; and the privity exists only between him and his principal."

"Directors who had no knowledge and took no part in the transaction were held not liable for moneys embezzled and misappropriated by the president of the corporation, who agreed to pay a milling company an excessive price for treating ore of the corporation in consideration of payment to him of part of the profits." 2 Thompson, Corporations (2 ed.) § 1280.

In *Deadrick* v. *Bank*, 100 Tenn. 457, 463 (45 S. W. 786, 788, it is said:

"That directors are liable in an action at law to their principal, the corporation, for losses resulting to it from their malfeasance, misfeasance, or their failure or neglect to discharge the duties imposed by their office, and in equity to the stockholders for these losses, the corporation declining to bring suit, is clear upon the authorities. Though the corporation is the legal entity, yet the stockholders are interested in the operations of the corporation while in a state of activity, and, upon its dissolution, in the distribution of its property, after all debts are paid; and so its officers or agents stand in a fiduciary relation to both. But it is otherwise as to creditors. The directors of a going corporation, whether able to pay its debts or not, owe no allegiance to them. It is true that the creditors may extend credit upon the faith that the company has assets to pay its debts, and that these assets are prudently managed, yet they are strangers to the directors. They maintain no fiduciary relation with them. There is a lack of privity between the two. As was said by the Supreme Court of the United States in *Briggs* v. *Spaulding*, 141 U. S. 132 (11 Sup. Ct. 924: 35 L. Ed. 662), the relation between the creditors and the corporation 'is that of contract and not of trust,' but there is nothing of either contract or trust in all ordinary cases

Sig. 15

to create any relation between the creditor and the directors. A creditor of a going corporation being thus a mere stranger, we think it clear that he can no more, after the suspension of the corporation by insolvency, either in law or equity, set in motion litigation to hold its directors liable for losses attributable merely to inattention than could the creditor of any other insolvent debtor maintain a suit against his agent under similar circumstances. In such a case as the one we are dealing with— that is, loss to the corporation resulting from mere negligence on the part of its directors—a creditor seeking to hold the directors liable for this loss, even in a suit like this, must rest his claim upon some provision of the positive law."

Defendant Albert T. Smith purchased stock in the bank from L. O. Ralston, giving his note for $5,000. Mr. Smith testified that on September 1, 1905, he sold his stock to Mr. Ralston, who surrendered his note, which he destroyed, and considered the incident closed. On September 12, 1905, Mr. Ralston consummated a deal with W. H. Moore and W. C. Morris, whereby he surrendered to them all the stock certificates he had purchased. The notes he had given for a large portion of these certificates were delivered over to him, and he severed his connection with the bank. A new board of directors was elected, with the exception of W. H. Moore and W. C. Morris. There are two periods in the administration of the Oregon Trust & Savings Bank—one from the date of the organization to September 12, 1905, and the other from the last-named date to the time of the appointment of the receiver. The losses claimed in this suit to have been sustained during the first period are upon the notes given for stock subscription and upon loans and cash advanced to the Order of Washington and to one Lafe Pence, two patrons of the bank. During the second regime plaintiff seeks to recover against the

directors for negligence of the board in failing to super-
vise the acts of their executive officers, and for the mis-
appropriation and misuse of the funds of the bank. Mr.
Ralston was called by plaintiff to testify in regard to
the transactions with the two patrons above named. Ac-
cording to his account, early in 1905, he learned that the
Order of Washington had borrowed money from the
bank, and he told the paying teller not to let any more
money go out of the bank unless it was O. K.'d by him.
He stated that he was never consulted in regard to but
one loan of $3,000, for which notes were offered as col-
lateral security of which he did not approve, and that
he refused the loan; that W. Cooper Morris said that he
was an officer of the Order of Washington, and that he
would see that whatever little overdraft they had would
be made good, and that there would be a large fund of
the order coming in shortly; that he (Ralston) knew that
the order was doing business in a small way at the bank,
and was making monthly payments; that, when a small
amount of money was wanted, he investigated the matter,
and would not make the loan to the order, but that small
sums were loaned to individuals; that he afterwards dis-
covered from the records that a large overdraft of the
order was being carried as cash; that after that he never
knew of any amount of credit being given to the order,
although he often examined the ledger and notes for that
purpose. Ralston further stated that Pence had been
dealing with the bank passing a great deal of money
through it, and that, when Pence wanted to borrow some
money, he (Ralston) and Morris went out and looked
over Pence's plant; that the proposition looked good, but
that they decided it was too much for their bank to carry,
or to advance money for, and that they decided not to
loan Pence any more money without ample security; that
Pence paid the notes he owed, and afterwards asked for
a loan of $5,000, proposing to give a certain note of

$10,000 as security, which proposition was satisfactory; that this security was not given; that when he returned from Eastern Oregon, he discovered that Pence had an overdraft in the bank, and that, when he inquired of Mr. Morris concerning the matter, Morris asked if Pence did not make arrangements with him to take the money; that he (Ralston) mentioned the promised security; that he then discovered that there was another such overdraft on the books, and ordered the tellers not to let another dollar go out of the bank unless O. K.'d by him; that Pence gave a note and commenced doing business at another bank, but that small sums were loaned to him until his arrangements were made.

The circuit court found that the defendants L. O. Ralston and Albert T. Smith, who were directors of the bank from the time of its organization until September 12, 1905, were not acting as such officers during the time that the losses complained of were sustained, except those resulting from loans made to the Order of Washington, and to Lafe Pence; that it did not appear that any who were creditors of the bank at the time the receiver was appointed were creditors of the same at the time defendants Ralston, Smith, and Copeland were directors; that the defendants L. O. Ralston, A. T. Smith, and W. H. Copeland, as officers and directors of the Oregon Trust & Savings Bank, performed all their duties in a careful and prudent manner during the time they served; that they employed, and sought to employ, only employees who were reputed to be careful, prudent, and efficient in the various departments in which they worked; that at all times they exercised reasonable control and supervision of all officers and agents of the bank in all matters pertaining to the business of the corporation during the period that they were directors, and that during such time they honestly believed that the books and accounts of the bank were being carefully and accurately kept;

that correct reports of loans and discounts were being made to Ralston, Smith, and Copeland; and that the bank was being conducted in a careful and prudent manner. The circuit court also found that they exercised such diligence and supervision in the care of the banking and the affairs of the corporation as the nature of the business of banking required; that none of the acts, or omissions to act, complained of in plaintiff's complaint, wherein it is alleged that the corporation and its creditors and stockholders sustained a loss by reason of the acts or omissions of defendants Ralston, Smith and Copeland, are sustained by the evidence; and that the said defendants should not be held liable for any losses sustained by the bank. We think this finding is fully justified by the evidence. While the exchange of the stock for the notes given therefor and held by the bank may have been irregular, it is not shown that any loss to the bank occurred on this account.

The defendant W. Cooper Morris did not appeal. He was one of the active figures in every business transaction of the bank, legitimate and illegitimate. When the bank opened, he put his own notes therein to cover his subscription to the capital stock, and afterwards took them out. He participated in all the manipulations and juggling of the capital stock and the stock notes. He had knowledge of the various transactions of the bank, of every bad loan made, and did the manipulating by which the treasury was looted. Some of these transactions were characterized by the most inexcusable and flagrant bad faith, while others were made to appear in the most favorable light possible by his misstatements and colorings. These matters furnish the basis of damages sought to be recovered in this suit. Defendant Walter H. Moore drew a salary of $250 a month during the time that he was president of the bank. He took part in the manipulation of the capital stock and stock

notes. He co-operated with Mr. Morris in the transaction of December 15, 1906, which resulted in the withdrawal of the notes of W. H. Moore, Morris, and Moore Bros. from the assets of the bank, aggregating some $100,000. W. H. Moore caused the board of trade company to be organized, and this company, under his direction, drew out over $80,000 from the bank in the form of over-drafts without giving any notes, security, or other evidence therefor, except the entries made in the bank books showing the cash withdrawn. Moore was about the bank every day, and evidently knew nearly all that was going on. While we do not impute to him any criminal intent, his conduct with reference to the affairs of the bank is in many respects wholly inexcusable. The question as to this defendant is, For what amount is he liable?

We find from the evidence that on December 15, 1906, W. H. Moore, president of the bank, and W. C. Morris, cashier, wrongfully withdrew from the assets of the bank the following notes:

Note of W. H. Moore, Moore Bros., and W. C. Morris,
    dated September 15, 1905 .............................................$  39,100.00
Note of W. H. Moore (Interest from April, 1905).......   5,000.00
Note of W. H. Moore and Moore Bros. (Interest from
    December 15, 1906) ................................................  10,000.00
Two notes of W. C. Morris (Interest from December
    15, 1906) .................................................................  25,000.00
Note of W. C. Morris (Interest from Dec. 15, 1906)        900.00
Note of W. C. Morris, Trustee (Interest from Septem-
    ber 15, 1905).............................................................  20,000.00

                                                                                     $100,000.00

Some payments were made on the $25,000 note, the amount of which is not shown, and for which we make some allowance on interest. In lieu of these notes, certain telephone stock which was then the property of the bank was carried into the general bond and warrant account in order to balance the books. As expressed by

W. H. Moore, the notes were written off the books, and the stock was written up in place thereof. He states that he consented to this arrangement with the understanding that the notes were not to be marked "Paid," and that they were to be left in the bank; that Morris put them in a small pouch, and that he has not seen them since; that they have not been paid. This was done without authority from the other directors, without consulting them, and without their knowledge.

4. W. H. Moore and W. C. Morris acted jointly in the fraudulent withdrawal and misappropriation of the notes for their mutual benefit, and Moore is jointly liable with Morris for the whole of such notes (*McCarty's Appeal,* 110 Pa. 381: 4 Atl. 925), with interest thereon at the legal rate from the above dates which are as accurate as can be given without the notes. W. H. Moore is also liable for loss on the Board of Trade Building Company to the amount of $40,735.74, with interest from August 21, 1907. This company was organized in October, 1906, at the instigation of W. H. Moore. Mr. E. R. Hickson, secretary of the Moore Investment Company, which was composed of Walter H. Moore and Henry A. Moore, by direction of W. H. Moore, subscribed for all the stock except two shares which were subscribed for by two other persons, who, with Mr. Hickson, constituted the officers of this corporation. Hickson held this stock for W. H. Moore. Mr. Hickson had no interest in this company, and acted as directed by W. H. Moore. The latter had obtained a contract for the purchase of a lot, and the company commenced the construction of a building. Shortly after its organization, the company drew checks on the Oregon Trust & Savings Bank for over $80,000, with no funds in the bank for that purpose. None of the incorporators of the Board of Trade Building Company had any real interest therein. When the receiver was appointed, the indebtedness due the bank from that

company was $80,735.74. The property of the company was transferred to the receiver, who realized $40,000 therefor. This transaction involves a question which runs through these two cases, viz., the amounts realized by the receiver upon the securities of the Oregon Trust & Savings Bank.

5. The receiver, as an officer of the court, should within a reasonable time adjust and settle the affairs committed to his charge. He is compelled to obtain the largest sum possible for the property and assets. The disposing of the property and securities under the direction of the court is in the nature of a forced sale, as upon execution in a foreclosure proceeding. It is extremely difficult for a receiver to speculate upon the market or wait for a favorable tide therein.

6. Ordinarily, if the amount obtained for the securities is the highest sum possible at the time they are disposed of, and is insufficient to satisfy the demand for which the securities are given, the balance of the claim is not canceled. Plaintiff seeks to recover for the loss of $50,000 in cash by reason of the manipulation of the books by Mr. Morris. This appears to have been a bookkeeping transaction for the purpose of fictitiously increasing the cash account. It is not shown that the money was taken from the bank. In other words, prior to that time the cash account was increased $25,000 by mere figures on August 23, 1906, and again on August 27, 1906, by a like amount, the same being credited to the account of loans and discounts without one cent being paid in cash. This was "written off," and the amount reduced $50,000 on December 15, 1906, without decreasing the amount of cash in the bank. This appears to have been done for general purposes. While it may have affected the other losses claimed in this suit, as well as being irregular and unfair to the public, we do not find any real loss in the transaction.

It is not shown that the interested defendants were in any wise concerned in, or responsible for, the shortages claimed by plaintiff, resulting through unexplained deficiencies in the following telephone stocks: Portland Home Telephone stock, par value $12,900; Tacoma Home Telephone stock, par value, $35,175; Omaha Telephone stock, par value, $27,550, as shown on the books of the corporation. It appears that the cashier, Morris, had charge of the bank books, and that his system of bookkeeping was anything but plain and correct. The claim of shortage in these stocks is based upon a faulty system of bookkeeping. The books of account are not a safe guide in this matter. It is a mere matter of conjecture as to whether or not there was a real shortage, or whether or not any shares were improperly disposed of. This is insufficient upon which to base any decree. The value of the Tacoma and Omaha stock, as indicated by the record, is very small, depending upon the result of two receivership suits. The receiver states that he does not consider them of any value. Plaintiff's brief states that nothing was paid for these telephone stocks, and that they are probably worthless.

7. On September 20, 1907, defendant W. H. Moore and wife conveyed to the receiver a tract in the City of Portland, being 150 feet frontage on Montgomery street and 100 feet on Water street, and 6,405 acres of land situated in Eastern Oregon and in the State of Washington, in order to secure the amount he owed the Oregon Trust & Savings Bank and to assist in paying the claims against the bank. On February 11, 1908, Moore and wife quitclaimed the above real estate subject to a mortgage indebtedness against the same, thereby releasing the property from all the conditions, stipulations, and reservations in the first deed given therefor. W. H. Moore asserts that it was understood that this property should be taken by the receiver at the valuation of $115,-

900, subject to mortgages for about $45,000. The receiver listed the same at the above figure of $115,900. Some testimony was introduced describing this real estate, and as to its value. It appears therefrom that the amount agreed upon between the receiver and Mr. Moore is not far from a fair value of the property, as near as can be ascertained. This amount should be credited by plaintiff on the sum due from W. H. Moore as of February 11, 1908. It is contended upon the part of plaintiff that this should not be done until the property is disposed of by the receiver and the amount of the proceeds over and above the insumbrances determined, and that the same should be settled in the receivership case. This, however, we do not deem to be equitable in the premises. We do not think that a large judgment should be rendered against defendant W. H. Moore without deducting the amount of the property so transferred.

Considering the case as to Elmer E. Lytle and Leo Friede, it appears that in September, 1905, upon the resignation of L. O. Ralston and A. T. Smith, the above-mentioned defendants were named as directors. Lytle, beginning in the month of June, 1906, met with W. H. Moore, W. Cooper Morris, and Leo Friede, as directors of the bank, every morning when not absent from the city, for the purpose of passing on loans requested by customers of the bank. Lytle did not hold any shares of stock in the bank until October 16, 1906, when he purchased 250 shares, paying $35,000 in cash therefor. In pursuance of an agreement between Morris, Moore, Lytle, and Friede certain loans were referred to them, and they were led to believe that all the loans made by the bank were so referred for their approval. From time to time they examined the notes in the pouches in order to ascertain what loans had been made. None of the loans complained of appeared among the notes or bills

receivable of the bank. As far as it was possible for them to do so, they directed the affairs of the bank with more than ordinary diligence. They required that weekly statement of the condition of the bank be furnished them, and they carefully examined such reports. These statements were prepared by the cashier, or under his direction, and they had no reason to think that the same were not true as the aggregate amount of assets and liabilities shown by such statements conformed to the aggregate amount of assets and liabilities as shown by the bank books. Lytle and Friede acted in good faith at all times, and fully believed that they knew of all the loans that were made, and of the condition of the bank. The reports showed the bank to be in a prosperous condition, and to be not only solvent, but gaining rapidly in deposits and assets. Especially in view of the contract between the receiver and the German American Bank, we think that these defendants should not be held liable for negligence.

It appears that in 1906 Henry A. Moore was requested by his brother, W. H. Moore, to act as a director. The former expected that his brother would transfer a share of stock to him in order that he might qualify. This was not done, and Henry A. Moore never became a stockholder, and was never formally elected. He did not qualify, and never acted as such director, except to meet informally with the officers while he had a real estate office in the bank building. His name, however, was printed on the bank stationery as a director, and also on the advertising cards upon which the assets of the bank were represented to be $2,000,000, and the bank shown to be in a flourishing condition. Henry A. Moore evidently understood that he was one of the directors, for in a certain criminal case, which was tried after the commencement of this suit, wherein W. Cooper Morris was defendant, he admitted that he had been a director

of the corporation at one time. He had no pecuniary
interest in the bank nor in the transactions involved in
this suit. He was not guilty of any fraudulent act per-
taining in any way to the business of the bank. It does
not appear that any of the directors, other than Morris,
knew that the statements on the advertising cards were
false.

8. If it be assumed that the cards and stationery were
printed and circulated with Henry A. Moore's consent,
"it is," as said in *Wakeman* v. *Dalley,* 51 N. Y. 27, 31
(10 Am. Rep. 551, 553), "an elementary principle that,
in an action to recover damages for fraudulent repre-
sentations, the plaintiff must show that he was deceived
by, and relied upon, the alleged representations." It was
held in that case that the director of a company is not
liable for representations, false in fact, but not known
by him to be so, made in published circulars of the com-
pany on which his name appears only as one of the list
of directors. From the whole of the evidence in the
case at bar it does not appear that Henry A. Moore had
anything to do with the bank, or that he had any influence
in the conduct of its affairs, or that he misled any party
interested in this case to his injury by permitting any
false representations to be made. He was not guilty of
any fraud in the matter. We think that the decree of
the circuit court should be changed as to Henry A. Moore,
and that he should not be held liable in this suit.

From the evidence it appears that no fraudulent con-
duct should be imputed to defendants Lytle, Friede,
Smith, and Copeland during their administration as
directors. No financial advantage in any sum was ever
realized or attempted to be realized by them, and there
was no embezzlement or misappropriation of the funds
of the bank by any one of them. None of these defend-
ants made any personal profit from the transactions of
the bank. Viewed in the light of subsequent events, the

supervision of the affairs of the bank was faulty. The funds were invested in telephone bonds of speculative value to large amounts. When inquiry was made of Cashier Mooris as to such investments, he stated that the bonds were simply held under a contract, and that they had not been purchased. Possibly these bonds would have proved a fair investment had it not been for the partial stagnation of business caused by the panic of 1907. From the disposition of many of the bonds after the bank closed, it was no doubt then expected that a fair amount would be realized therefor. When an investigation was made by some of these directors as to loans, and further loans to certain parties were ordered to be refused, the cashier, in direct violation of his directions, secretly made the loans, or pretended loans. In many other instances, either for personal gain or otherwise, the cashier misled and misinformed the directors as to the true state of affairs. When an expert was employed to examine the accounts of the bank, Mr. Morris, for reasons apparently sufficient, discharged him after he had worked for a time, but before any report was made, and before any information was gained by the directors. The directors comprised all the stockholders of the institution.

9. There is a strong presumption that they exercised their best judgment in conducting the affairs of the bank. This would be to their interests. A short time before the receiver was appointed, defendant Lytle purchased 250 shares of stock in the Oregon Trust & Savings Bank, paying $35,000 therefor. This was certainly an indication of good faith on his part. It behooved him to do his very best in the interest of the bank in order to lessen his chances of losing the money he had put in. While it does not appear that he was an expert banker, yet he met at the bank nearly every day, in conjunction with Mr. Friede, to look after the business. The two men

exerted themselves and exercised their best judgment and skill in the interests of the bank, although their advice was not always followed, and acted at all times in good faith. Instead of being shown to have been grossly negligent in regard to their duties, they appear to have been deceived by the adroit manipulations and fraudulent schemes of Morris. Under all the circumstances in the case, they should not be held liable for negligence under the conditions of the contract above referred to, in a suit in which the German American Bank is principally interested. The payment of claims was made by Willis as an officer of the German American Bank pursuant to the contract, and he, by taking an assignment of such claims, would stand in the place of that bank, and not in the position of the original creditors.

10. As a general rule, directors are charged with the duty of reasonable supervision over the affairs of the bank. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision over its affairs.. They are not insurers or guarantors of the fidelity and proper conduct of the executive officers of the bank and are not responsible for losses resulting from their wrongful acts or omissions, provided they have exercised ordinary care in the discharge of their own duties as directors.

11. Ordinary care, in this matter as in other departments of the law, means that degree of care which prudent and diligent men would ordinarily exercise under similar circumstances. The degree of care required further depends upon the subject to which it is to be applied, and each case must be determined in view of all the circumstances of that particular case. If nothing has come to the knowledge to awaken suspicion that something is going wrong, ordinary attention to the affairs of the institution is sufficient. If, on the other

hand, directors know, or by the exercise of ordinary care should have known, any facts which would awaken suspicion and put a prudent man on his guard, then a degree of care commensurate with the evil to be avoided is required, and a want of that care makes them responsible. Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. Directors are not expected to watch the routine of every day's business, but they ought to have a general knowledge of the manner in which the bank's business is conducted, and upon what securities its larger lines of credit are given, and generally to know of and give direction to the important and general affairs of the bank. They are not required to be bookkeepers.

12. It is incumbent upon bank directors in the exercise of ordinary prudence and as a part of their general supervision to cause an examination of the condition and resources of the bank to be made with reasonable frequency. *Rankin* v. *Cooper* (C. C.), 149 Fed. 1010, 1013. See, also, *Campbell* v. *Watson,* 62 N. J. Eq. 396 (50 Atl. 120).

13. To render directors or other officers of a corporation liable to it for the fraudulent or wrongful acts of other officers, they must have participated therein, or else they must be chargeable with culpable negligence. Clark & Marshall, Private Corporations, vol. 3, p. 2279, § 751; *Briggs* v. *Spaulding,* 141 U. S. 132 (11 Sup. Ct. 924: 35 L. Ed. 662).

14. If a director performs his duty as such in the same manner as such duties are ordinarily performed by all other directors of all other banks of the same city, it cannot be fairly said that he was guilty of gross negligence. *Swentzel* v. *Penn. Bank,* 147 Pa. 140 (23 Atl. 405, 415: 15 L. R. A. 305: 30 Am. St. Rep. 718, 722) ; Bolles, Modern Law of Banking, p. 280; *Spering's Appeal,* 71 Pa. 11, 21 (10 Am. Rep. 684).

15. The president, cashier, and other employees of the bank, although selected by the directors, are not the agents or servants of the directors, but of the corporation. *Briggs* v. *Spaulding,* 141 U. S. 132 (11 Sup. Ct. 924: 35 L. Ed. 662); *Wallace* v. *Lincoln Savings Bank,* 89 Tenn. 630 (15 S. W. 448: 24 Am. St. Rep. 625); Morawetz, Private Corporations, § 552, *et seq.* Our construction of the contract in evidence to which we have referred renders it unnecessary to pass upon all the questions discussed by counsel in their briefs. To comment upon all the phases of the case which we have examined and considered would make this opinion too lengthy.

The decree of the lower court will therefore be modified as herein indicated.                    MODIFIED.