**FEDERAL DEPOSIT INSURANCE CORPORATION, a Federal corporation, Plaintiff,**

v.

**Billie BOONE, one and the same person as Mrs. James W. Boone, et al., Defendants,**

and

**United States Fidelity and Guaranty Company, a corporation, Third Party Plaintiff and Cross-Claimant.**

**Civ. No. 70-210.**

United States District Court,
W. D. Oklahoma.

Dec. 20, 1972.

134

John H. Cantrell and E. W. Keller, Oklahoma City, Okl., for plaintiff.

Robert J. Petrick, Oklahoma City, Okl., for U. S. Fidelity and Guaranty Co.

David Ross, Ross, Ross & McCarty, Newkirk, Okl., for R. R. Boone.

C. D. Northcutt, Ponca City, Okl., and Lynn J. Bullis, Jr., Oklahoma City, Okl., for defendant directors.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BOHANON, District Judge.

The above entitled action came on for final trial on plaintiff's first cause of action on August 14, 1972, before the Court and without a jury.

Plaintiff introduced its testimony and evidence by way of documents and rested; and the defendant, cross-claimant, United States Fidelity and Guaranty Company, a corporation, offered its evidence and documents and rested, and the living defendant Board of Directors offered their testimony and exhibits and rested. The James W. Boone Estate offered no testimony and entered its general denial of liability.

The plaintiff, Federal Deposit Insurance Corporation, hereinafter referred to as FDIC, was and now is a corporation duly organized and existing under and by virtue of the laws of the United States, Title 12 U.S.C. § 1181. The Bank of Commerce of Tonkawa, Oklahoma, hereinafter referred to as "The

Bank" was an Oklahoma banking corporation organized and existing under the laws of the State of Oklahoma, having its office and place of business in Tonkawa, County of Kay, State of Oklahoma. The Bank was an insured bank of the FDIC having been covered by insurance provided by the FDIC under and by virtue of the laws of the United States of America and of the State of Oklahoma.

On September 25, 1968, the Bank Commissioner of the State of Oklahoma determined The Bank to be insolvent and unable to pay its depositors in full and that an emergency existed, and pursuant to the Oklahoma Banking Code of 1965 and amendments thereto, assumed and took possession of The Bank and all of its assets on said day, and at said time selected and appointed the FDIC as his liquidator and agent to do and perform any act necessary to liquidate said bank and realize upon its assets. Since said date said Bank Commissioner of the State of Oklahoma has been and remains in possession and control of said Bank for liquidation and dissolution purposes and in the cause thereof as liquidator vested in the plaintiff, FDIC, each, every and all assets, claims, rights, demands, and choses in action hereinafter set out. Said assets, and each of them, were sold, assigned, granted, conveyed transferred, set over and delivered to this plaintiff, FDIC, to be taken, held, owned and realized upon exclusively by it as its own property, for good, valuable and sufficient consideration on or about October 7, 1968, by and with the formal written consent and approval of the District Court of Kay County, Oklahoma, upon petition duly presented, considered and granted, all as provided for and authorized by the statutes of the United States of America, Title 12 U.S.C. §§ 1823(d) and 1823(e), and as permitted by the Oklahoma Banking Code of 1965.

The jurisdiction of this Court exists and arises under and by virtue of Title 12 U.S.C. § 1819. This suit was originally instituted, and is maintained by the FDIC as original plaintiff in its own right and solely in its capacity as a Federal Corporation. The United States Fidelity and Guaranty Company, hereinafter referred to as the USF&G, third party plaintiff, is an insurance and surety corporation, organized and existing under and by virtue of the laws of the State of Maryland with its principal place of business in the City of Baltimore, State of Maryland. The said USF&G was at all times referred to herein duly licensed to do business in the State of Oklahoma and as such insurance corporation wrote and issued to The Bank its two (2) surety bonds, towit: Bankers' Blanket Bond, No. 24, in the penal sum of $300,000.00, said bond being also No. 57193–02–4103–67, and Excess Bank Employee Dishonesty Blanket Bond, No. 28, in the penal sum of $1,000,000.00, with a $300,000.00 deductible, said bond being also No. 5793–02–4104–67. That as a result of its responsibility under said bonds, the USF&G paid into the hands of the State Bank Commissioner of Oklahoma the sum of $209,959.33, the same being a recognized obligation on account of forged notes, less any proper credits, for which the Bank of Commerce was deemed to be liable, and the USF&G, by cross action, seeks recovery of and from the other defendants hereinabove named and for an amount equal to the amounts upon and for the same to whatever extent the Court may determine the USF&G has paid or which USF&G is or may be hereafter required to pay in payment of its liability under said bonds or for which it may become or be held liable in this action.

After all credits and offsets, FDIC claims its' loss, directly caused by the wrongdoing, dishonesty and negligence of James W. Boone, deceased, and the concurring negligence of the other principal living officers and directors in the sum of $231,607.17; and third party plaintiff, USF&G, claims the sum of $209,959.33.

The estate of James W. Boone˙denies liability, and each and all of the living named defendant directors deny liability

to the plaintiff, FDIC, and third party plaintiff, USF&G, alleging that said directors were not negligent and that they used reasonable diligence in their duties as officers and directors of The Bank.

### Findings of Fact

1. At the beginning of each year's term as directors, each elected director subscribed and swore to and filed with The Bank for filing with the Bank Commissioner of Oklahoma his oath in writing as follows:

"We the undersigned Directors of the Bank of Commerce of Tonkawa, Oklahoma, Oklahoma, do each, for himself and not one for the other, on oath solemnly swear that we will severally, so far as our several duties devolve upon us as directors, diligently and honestly administer the affairs of said above named bank, both as prescribed by the by-laws of said bank and the laws of the State of Oklahoma.

\* \* \* "

2. There is no evidence in this record to establish that any of the living defendant officers and directors hereinabove named ever profited so much as $1.00 by any dishonest act or deed. There is no evidence that any living director ever conspired with or cooperated with James W. Boone or participated in his various secret, dishonest, unlawful and deceitful acts, conduct and deeds, including forgery. There is no evidence to be found in this record of any illegal act on the part of any of the living defendant officers and directors, and further the plaintiff and third party plaintiff do not charge that the living defendant officers and directors were in anywise dishonest, but only that they were negligent in their duties and exhibited a manifest lack of diligence.

3. The sole question before the Court is whether or not the living defendant officers and directors above named were not diligent in the performance of their duties as officers and directors as to make them liable for the losses sustained by the FDIC and losses sustained by the USF&G.

4. The dishonest conduct and behavior of James W. Boone, president, manager and majority stockholder (65%) of The Bank, was discovered in a unique and unusual way. The manner in which the discovery was made and in which The Bank was closed is set out in the following written statement of FDIC Examiner Myron Scheer (Plaintiff's Exhibit 16), which is quoted verbatim and which the Court finds to be a proper finding of fact. Accordingly, the statement or report is adopted by the Court as its Finding No. 4:

[The statement is omitted for purposes of publication.]

5. The Court now comes to the next very important document in relation to the issues in this case, and that is the audit reports made by the certified public accountants. John William Burns, a certified public accountant and a graduate of Oklahoma University and a practitioner of certified public accountant work from 1947 until 1966, made the audit report of The Bank for January, 1963, and later made the March, 1965, audit report of The Bank, thus having made the audit reports for the years 1963 and 1965.

The Court finds that William F. Eubank, a certified public accountant and a graduate of Missouri State College, who bought out John William Burns' interest in the auditing firm of Burns, Lowrey and Cortwright, and admitted by the plaintiff to be a well qualified certified public accountant, made the audit report of the bank for July, 1966, January, 1967, and February, 1968.

From these audit reports the bank was given an unqualified bill of health. Each audit was made in great detail consuming approximately 125 to 140 hours of auditing work. Each audit report for the years 1963, 1965, 1966, 1967 and 1968 states substantially as follows:

"At the request of the Examining Committee we have examined the balance sheet of the Bank of Commerce, Tonkawa, Oklahoma, as of (Mo. Day Yr.). Our examination was made in

accordance with generally accepted auditing standards and accordingly included such tests of the accounting records in relation to the balance sheet only and such other auditing procedures as we considered necessary in the circumstances. We submit the following report of examination made as of (Mo. Day Yr.)."

and concludes as follows:

"In our opinion, the appended balance sheet presents fairly the financial position of the Bank of Commerce, Tonkawa, Oklahoma, at (Mo. Day Yr.) in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year."

The Court finds from the evidence and foregoing certified public accountant audit reports for the years 1963, 1965, 1966, 1967 and 1968 that they are competent and reliable and that the living members of the Board of Directors, the Oklahoma Bank Commissioner and the FDIC relied upon the same and no successful challenge to said audit reports has ever been made by plaintiff or third party plaintiff.

6. The Court has carefully examined the Oklahoma Bank Commissioner's certified "Report of Examination" of The Bank dated June 1, 1965, and prepared by Examiners Wayne Davidson, Wallace L. Reneau and Tom Holiday (Plaintiff's Exhibit 10). In this report the Conclusions and Recommendations are stated as follows:

*"Nonconforming Assets:*

Attention is called to page 2-a where it has been necessary to schedule one line of credit as exceeding the limitation imposed by the Oklahoma Banking Laws. Similar violations have occurred on occasions in the past. It would seem incumbent on the part of management to exert greater effort to assure compliance with the applicable statutes.

*Loans and Discounts:*

Loans subject to adverse classification can be found under the appropriate schedules. The total of loans adversely classified is not considered excessive but it would appear that a review of security requirements and collection procedures for all lines of credit would be justified. In this manner, not only could the classified lines be strengthened, but the weakening of other lines could be prevented. Management should give these lines immediate attention to prevent further deterioration.

Also listed in the loan schedules is a number of loans lacking the proper credit information, insurance policies or real estate requirements. Management should make corrections in the files as soon as possible."

The Court finds from the minutes of The Bank's Board of Directors meeting of July 21, 1965, the following, as pertaining to the above report:

"The letter of Mr. George T. Frame, Assistant Bank Commissioner was read to the Board by President Boone. Also the report of examination of Wayne Davidson for the State Banking Department was read by President Boone and discussed by the Board of Directors. Management stated efforts would be made for reductions and additional security of the lines classified. The Board accepted the report."

7. The Court has carefully examined the Oklahoma Bank Commissioner's certified "Report of Examination" of The Bank dated September 26, 1966, and prepared by Examiners Wallace L. Reneau, Elton Clelland, T. L. Holiday and Dan Tucker (Plaintiff's Exhibit 9). In this report the Conclusions and Recommendations are stated as follows:

*"Loans and Discounts:*

The total of adversely classified loans shows a substantial increase over the amount reported in the last Examination Report of this Department. Overdue loans amount to 5.07% of the total loans.

The loan portfolio reveals a tendency to make out-of-territory loans to vari-

ous individuals and business interests, some of a rather hazardous nature. Such advances are considered unwise, due in part to the lack of a satisfactory servicing policy on loans such a distance from the bank.

Attention is directed to the R.L. Marler line of credit, which is given a substandard classification in this report. This line's lack of security protection indicates a weakness in the lending policy, that if continued, will likely result in some rather serious losses.

A number of loans are listed for lack of proper supporting credit information. Management should make the indicated corrections in order to strengthen the bank's credit position.

*Internal Routine and Controls:*

This important phase of the bank's operation appears to be handled in a satisfactory manner with no constructive criticism to be offered at this time."

The Court finds from the minutes of The Bank's Board of Directors meeting of November 16, 1966, the following, as pertaining to the above report:

"The letter from Mr. George T. Frame, Deputy Commissioner of the Oklahoma State Banking Department, was read to the Board of Directors by President Boone. The accompanying report of examination by Examiner Wallace L. Reneau of September 26, 1966 was also read and discussed by the Board of Directors. The Board accepted the recommendations of the report."

8. The Court has carefully examined the Oklahoma Bank Commissioner's certified "Report of Examination" of The Bank dated September 25, 1967, and prepared by Examiner Wallace L. Reneau (Plaintiff's Exhibit 8). In this report the Conclusions and Recommendations are stated as follows:

*"Loans and Discounts:*

Lines of credit considered less than bank investment quality are listed in the various loan schedules of this report. Adversely classified loans are as follows, Substandard $79,559.55 and Loss $906.28, also there are two lines which are listed for special mention total amount of $21,124.06. All of these lines of credit are commented upon and should have the management's close supervision with a view of rejection of further extensions, liquidation of the present obligations and/or the acquisition of additional security to properly protect the bank's interest. It is noted that a number of the lines of credit are being made to out-of-territory customers, some as far away as Tulsa and Oklahoma City. Such credit advances are considered unwise due to the lack of a satisfactory servicing policy for loans such a distance from the bank.

A number of technical exceptions are listed in the loan schedule for convenience of management in making the desired improvements.

The policy of extending credit in the form of overdrafts was discussed with management. It was noted that the Atlas Tank Company account had an average daily overdraft balance of $12,303.41 for the period from July 1, 1967 to date of this examination. Unsecured credit advances of this nature are not considered to be a sound banking policy.

*Endorsed or Place Paper:*

The bank has been endorsing notes to their correspondent banks, sending the instrument to such bank, making the entries on this bank's general ledger accounts, without a firm agreement that such notes will be accepted by the correspondent bank. In some cases the correspondent bank returns the note without having ever entered these on their books, no record would be found showing the transmittal from this bank or the return of the correspondent bank. Endorsements on such notes do not indicate to which bank the note is being endorsed, the date of such endorsement, nor any information from the correspondent

bank. Some of these notes are accepted by the correspondent bank, entered on their books, held for a time and later repurchased by this bank without the endorsement of the correspondent bank. This matter was discussed in detail with President Boone and Vice-President King.

*Internal Routine and Controls:*

The reconcilement of the correspondent bank accounts are not being verified by an officer of the bank, other than the person making such reconcilement, and such verification being evidenced by this person signing such reconcilement.

Other detail operations appear to be handled in a satisfactory manner with no criticism to offer at this time."

The Court finds from the minutes of The Bank's Board of Directors meeting of December 13, 1967, the following, as pertaining to the above report:

"President Boone presented the report of examination of the State Banking Department resulting from an examination by their examiners which Wallace L. Reneau was in charge. The examination was begun on September 25th. Each line of credit subject to classification and special mention was discussed in detail. Where possible lines will be further reduced or secured in line with the criticism of the examiners. The problem of extending credit in the form of overdrafts was discussed."

9. The Court has carefully examined the certified "Report of Examination" of The Bank made by the FDIC and dated February 21, 1966. The Report was prepared by Examiners Delbert R. Sutter and Stanley Pugh (Plaintiff's Exhibit 13). In this report the Conclusions and Recommendations are stated as follows:

*"Nonconforming Asset*

The real estate loan listed on the following page apparently does not conform with statutory provisions as noted in the individual comments. Nonconforming loans are not regarded as acceptable assets for a commercial bank to carry. Management stated the infraction was due to an oversight and promised immediate corrective action.

*Loans and Discounts*

The extensions of credit considered subject to classification total 59,350.-79 Substandard, 702.18 Doubtful and 4,984.76 Loss, before application of the reserve account of 11,063.32. In addition, one loan in amount of 13,500.00 is listed for Special Mention for attention as noted in the individual comments. Although the total of such paper is not too disproportionate in relation to all loans, the individual items are deserving of aggressive attention by the management to improve the bank's position at every opportunity.

A number of technical exceptions are itemized in the report for the convenience of the officers in making the desired adjustments. Lines of credit should be fully supported at their inception and the credit files should be maintained in current condition.

*Securities*

It is observed the book value of securities exceeds the estimated market value a total of 32,842.72. While all issues carried are regarded as being of investment quality, the existing depreciation should not be overlooked when future investment policies are being formulated.

*Contingent Liability*

It is noted the Blackwell Retail Credit Association and subject bank are defendants in a 10,000.00 lawsuit. Counsel for the bank is of the opinion there will be no loss to the bank. Refer to page 10-a herein for additional information.

*Elimination of Assets*

The items classified loss were charged off at the close of the examination or will be eliminated as noted in the individual comments."

The Court finds from the minutes of The Bank's Board of Directors meeting

of April 20, 1966, the following as pertains to the above report:

"The letter from Mr. Stanley Pugh, Supervising Examiner of the Federal Deposit Insurance Corporation, of April 6, 1966 was read to the Directors. The Report of Examination by Delbert I. Sutter and other members of the examining force of February 21, 1966 was presented by Mr. Boone.

In the report on page 2-a attention was called to a nonconforming asset: the real estate loan of Robert Hobson euex was inadequate on the appraised value. As a part of these minutes and attached to them is a new appraisal of $10,000 made by an appraiser of the Federal Land Bank.

The twelve loans listed in Loans Subject to Classification were discussed by the Board. Efforts will be made by the officers to position the bank in a more secure position on these credit lines."

10. The Court has carefully examined the certified "Report of Examination" of The Bank made by the FDIC and dated April 17, 1967. The Report was prepared by Examiners Myron R. Scheer and Stanley Pugh (Plaintiff's Exhibit 12). In this report the Conclusions and Recommendations are stated as follows:

*"Nonconforming Assets"*

Four mortgage loans on real estate security are listed as apparently not in conformance with provisions of the Oklahoma Banking Code of 1965. In each instance, the inclusion of an unlimited advance clause and the granting of additional advances have created the condition that appears to violate the Code. President Boone and other officers of the bank stated the bank's attorney would be contacted to write a new advance clause form on legal basis for use in future mortgage loans. He also stated the four listed loans would be brought to conforming condition as rapidly as possible.

*Loans and Discounts*

Twenty lines of credit are listed for criticism with 77,064.48 classified Substandard, 2,518.52 regarded as Loss and 112,847.16 listed for Special Mention. A close review of the notecase indicated that in several instances credit is being advanced without suitable bank protection to borrowers lacking ability to absorb much loss and that the bank's position is not studied carefully in the granting of further advances. As discussed with the president and the other credit officers, early adjustment to correct these dangerous practices will merit the attention of the directorate.

Overdue loans, at about 4.4 percent of total volume, suggest a need for closer maturity servicing and, perhaps, a more effective collection policy. Credit information also appears to present some neglect. While credit files are neat and in good order, some system of following up missing and delayed financial statements could be employed to provide the credit officers with the current credit information needed in following the affairs of the borrowers.

*Capital Protection and Conservation of Earnings*

An unusually large cash dividend of 12,000.00 was distributed in 1966 and followed by the charge-off of substantial loan losses which aggregated about 21,700.00 thus far in 1967. As a result, capital funds failed to grow in proportion to the advance in business volume. The relationship of the total capital account to average total assets for the past year has declined to 7.0 percent which reflects unfavorably when compared to the 8.0 percent average for all insured commercial banks and 8.9 percent for Oklahoma banks. President Boone acknowledged the need for adjustment in capital protection and stated the directorate would be asked to conserve all net profits this year to further that program.

*Oil and Gas Leases*

During the past year a portion of the credit of Jeff and Ann Morgan was charged off and their interests in four oil and gas leases were acquired.

Earnings from these properties now owned by the bank, were not reflected as bank income but were applied directly to the book amount of the asset which presently stands at 4,983.28, estimated to be the approximate full value of the lease interests. Sale of this substandard asset is contemplated after title is perfected.

*Contingent Liability*

The bank is defendant in a suit entered by a former owner of chattels obtained by the bank through foreclosure against a subsequent holder. Defense counsel estimates no loss will result from this suit.

*Internal and External Controls*

Review indicates the directorate and bank officials have been active in developing internal control and protection against burglary, holdup and theft. It is noted, however, that negotiable collateral is permitted to be held in the credit files rather than under locked, dual control security. Also, provision has not been made to maintain "decoy" money (currency with registered serial numbers) in the vault and in the cash of each teller.

*Disposition of Assets Classified Loss*

The loan of Charlotte Todd, classified Loss in amount of 1,375.00, is to await results of the June, 1967, harvest and possible application of wheat proceeds before the remaining balance is to be charged off. The other two loans classified loss were to be charged to the valuation reserve directly following the close of this examination.

The Court finds that the minutes of the Bank's Board of Directors meeting of June 21, 1967, reflect the following as pertains to the above report:

"President Boone read a letter from Mr. Stanley Pugh, Supervising Examiner of the Federal Deposit Insurance Corporation, which was accompanied by the Report of Examination which was held at the close of business April 17, 1967 by that agency. He then reviewed to the Board of Directors the Report of Examination. He also read a letter addressed to Mr. Pugh dated June 20, 1967 written by him in regard to the four lines of credit of nonconforming assets noted in the Report of Examination; also a letter from Mr. Robert N. Colombe, counsel for the Bank, dated June 7, 1967 addressed to the Bank of Commerce in regard to the extension clause in the Real Estate mortgages given to the Bank of Commerce.

The Board acknowledged receipt of the Report of Examination and President Boone stated that some measures had been taken in regard to adequate security where noted and others would be."

The following correspondence, which is mentioned above, specifically relates to the April 17, 1967 "Report of Examination."

### "FEDERAL DEPOSIT INSURANCE CORPORATION

June 2, 1967

The Board of Directors
Bank of Commerce
Tonkawa, Oklahoma

Gentlemen:

We enclose a copy of the report of examination made of your institution by Examiner Myron R. Scheer as of April 17, 1967. A copy is also being mailed to the State Banking Department.

A comparison of this report of examination with the February 21, 1966, report reveals several adverse trends. First, loan volume has jumped from two million dollars to two and one-half million dollars, without a corresponding increase in deposits, and now is rather high at approximately 60% of resources. Placed paper also has risen from $496,000 to $708,000. Moreover, credit losses already have been substantial this year and Examiner Scheer has found deficiencies in loan servicing procedures. These factors suggest overall lending policies should be revised to prevent serious difficulties in the future.

While the exposure in the loan account has been increasing, the capital ratio

has dwindled to 7% and the modest loan valuation reserve has shown little change. If your plan to overcome the capital deficiency through conservation of earnings is not successful, consideration should be given the sale of new stock.

Among the other matters needing attention are four nonconforming lines of credit. We ask that you notify us at an early date that they have been placed in conforming status.

The report should be reviewed at the next convening of the Directorate, and it is requested three certified copies of the official minutes of the meeting be forwarded to this office and one copy to the State Banking Department reflecting action taken. Also, please complete the attached receipt form and return it to this office.

> Very truly yours,
> /s/ Stanley Pugh
> Stanley Pugh
> Supervising Examiner"

"June 20, 1967

Mr. Stanley Pugh,
Supervising Examiner
Federal Deposit Insurance Corporation
1708 Federal Reserve Bank Building
Kansas City, Missouri 64106
Dear Mr. Pugh:

In your letter of June 2, 1967 relative to the four nonconforming lines of credit listed in our recent examination report, you ask that we notify you at an early date that these have been placed in a conforming status. The notes of Mr. R. C. Sipe have been rewritten into the real estate loan set up on an amortized basis which makes them conform to section 803D of the State Banking Code.

The other three lines of credit, namely Jerry J. Hall, Donald Lucas and Max Smith were not discussed with us by the Examiners and we were somewhat surprised to find that these were classified as nonconforming notes. We have discussed these three lines with our attorney and he informs us that,

in his opinion, these lines do not violate section 803D of the State Banking Code. We are enclosing a copy of his letter and opinion on these lines of credit.

Please let us know if this meets with your approval.

> Yours sincerely,
> President

JWB:m
enc."

"June 20, 1967

Mr. Carl Sebring
State Banking Commissioner
Oklahoma State Capital
Oklahoma City, Oklahoma
Dear Mr. Sebring:

I am enclosing a copy of my letter to Mr. Stanley Pugh, Supervising Examiner with FDIC Corporation and also copy of letter to this Bank written by Robert N. Colombe, Attorney.

> Yours sincerely,
> President

JWB:m
encls."

"OKLAHOMA STATE BANKING DEPARTMENT

CARL B. SEBRING, Bank Commissioner

OKLAHOMA CITY

GEORGE T. FRAME
Deputy Commissioner

June 23, 1967

Mr. J. W. Boone, President
Bank of Commerce
Tonkawa, Oklahoma 74653
Dear Mr. Boone:

We acknowledge receipt of your letter of June 20, 1967, with which you enclosed copy of your letter to Mr. Stanley Pugh, FDIC, and copy of one to your bank from Mr. Robert N. Colombe, attorney.

> Yours very truly,
> /s/ Carl B. Sebring
> Carl B. Sebring
> Bank Commissioner

CBS:em"

"FEDERAL DEPOSIT INSURANCE CORPORATION

June 22, 1967

Mr. J. W. Boone, President
Bank of Commerce
Tonkawa, Oklahoma 74653

Dear Mr. Boone:

Your prompt response to our June 20, 1967, letter is appreciated and we are marking our files to show that the nonconforming R. C. Sipe line has been corrected. With regard to the other three nonconforming lines, we understand the desire of the bank to utilize the advance clause in the real estate mortgage to provide additional protection on loans where other security may be marginal. It appears the $856.75 advance to Jerry J. Hall could have been excluded from consideration because it is fully secured by a lien on an automobile. This possibly would place the line in a conforming amount. However, in the case of the Lucas and Smith lines, Examiner Scheer has carefully excluded each note not primarily dependent on the real estate for protection, and the total in each instance still exceeds the applicable legal limit. Consequently, corrective action is needed.

Very truly yours,

/s/ Stanley Pugh

Stanley Pugh
Supervising Examiner"

11. The Court has carefully examined the certified "Report of Examination" of The Bank made by the FDIC and dated May 11, 1968. The Report was prepared by Examiners Myron R. Scheer and Lloyd Thomas (Plaintiff's Exhibit 11). In this report the Conclusions and Recommendations are stated as follows:

"*Nonconforming Assets*

Again at this examination, this bank is cited for an apparent violation of the Oklahoma Banking Code of 1965. Due to a clause in this bank's real estate mortgages covering all subsequent advances, the loans of Max J. Smith appear to be in excess of the maximum amounts allowable. President Boone expressed the opinion that additional advances are not secured by the real estate mortgage for the purpose of computing the maximum loan. He stated that he would request an opinion be obtained from the State Attorney General in regard to this section of the Oklahoma Banking Code. If this opinion fails to support his position, he stated corrective action would be taken immediately. Since the Max J. Smith real estate loans were listed as apparent violations at our last examination, bank officials should make every effort to resolve the matter at an early date.

*Capital Structure*

This bank has suffered substantial net loan losses, totaling 74,477.00, since January 1, 1964, including 1,980.32 classified Loss at this examination. Also in 1966 and 1967 dividends were declared in excess of 50 per cent of the net profits before dividends which appear to be contrary to the resolution adopted June 22, 1961, by the bank's directors in conjunction with their efforts to acquire Corporation approval of plans to operate a drive-in facility. These factors, coupled with the favorable growth enjoyed by this bank, have resulted in a decline in the capital-to-assets relationship to the present 6.4 per cent which is well below the national average of 7.9 per cent for all insured commercial banks.

President Boone expressed the opinion that the bank had fulfilled its obligation under the resolution since total dividends did not exceed 50 per cent of total earnings before dividends when considered for the past three years. President Boone also stated the directors would improve the capital structure by selling 100,000.00 of capital debentures as soon as Supervisory Authority approval can be obtained.

*Loans and Discounts—Overdrafts*

Credit continues to be granted on a liberal basis. Loans considered subject to criticism at this examination include 71,072.82 classified Substandard and 1,980.32 Loss and 13,272 listed for special mention. Liberal advances of credit, without adequate bank protection such as those to Louvee Montooth and O. L. Pittman, listed for special mention herein, place the bank in a weak position should the attitude or business fortunes of the borrowers change. The need for a review of credit policies is indicated by substantial net loan losses of 74,477.00 since January 1, 1964. Closer screening of applicants is necessary to determine if borrowers can provide adequate bank protection and have the ability to repay their loans in the normal course of business.

Overdue loans constituting 3.8 per cent of the loan portfolio were noted. Also, technical exceptions detailed herein are numerous again at this examination. These factors indicate loan officers need to exert additional efforts to properly support each loan at the inception, maintain the files in a current condition, and provide servicing when the loan matures.

Overdrafts of 22,953.41 on the examination date are considered disproportionate. Two small overdrafts in the amount of 23.60 are classified Loss. A review of bank records reveals numerous individuals, including one bank officer and several bank employees, abuse this privilege by having habitual overdrafts. This is considered a weak method of granting unsecured credit and should be discouraged where possible. President Boone stated the overdrafts are somewhat inflated by the method in which checks are posted. However, he stated he was giving consideration to adopting a policy that no overdrafts be granted to bank personnel.

*    *    *    *    *    *

*Disposition of Assets Classified Loss*

Loans and overdrafts classified Loss were charged to the appropriate accounts at the close of the examination."

The Court finds that the minutes of the Bank's Board of Directors meeting of June 12, 1968, reflect the following, as pertains to the above report:

"President Boone reported that the bank was examined by the FDIC as of May 11, 1968 and hoped their report would be in his hands by the next Directors meeting."

The Court finds that the minutes of the Bank's Board of Directors meeting of July 10, 1968, reflect the following as pertains to the May 11, 1968 report:

"President Boone presented the report of examination by the FDIC as of May 11, 1968. Mr. Boone stated he thought the report was very thorough and he and the other officers would take action to try and correct the criticism in the report.

President Boone stated he was going to visit with Mr. Sebring, the Bank Commissioner of Oklahoma, in regard to issuing capital debentures to increase the capital structure of the bank."

12. The Court finds from a study of Plaintiff's Exhibit 14 that the officers and directors made an examination of The Bank's books and records, as per the "Certificate of Examination by Directors and Statement of Officers" for January, 1962, January, 1963, January, 1964, July, 1964, January, 1965 and July, 1965, wherein the officers and directors all signed the "Certificate of Examination" for each of the years above stated. The "Certificate of Examination by the Directors" states, among other things:

(1) That the examining committee made a thorough and complete examination of the books, records, funds and securities and other assets and liabilities held and owned by said bank; that all accounts among the re-

sources and liabilities were verified; that the loans and other securities were carefully examined, and pronounced genuine, sufficiently secured and collectible, with no exceptions.

(2) That this bank has no concealed liabilities, and that no certificate of deposit has been issued and used by this bank as security for any loan or deposit from any other bank.

(3) That this bank has no loans to active managing officers, or accommodation loans, and no loans exceeding the lawful loan limit, and all loans held by this bank are valid and bear the genuine signature of the maker.

(4) That the resources and liabilities for each examination and year are stated on each respective "Certificate."

The Court finds no record of any objections or complaints made by the Oklahoma Banking Department or the FDIC to any of the "Certificates of Examination by Directors" above referred to.

The next section of the Court's findings will be devoted to evidence relating to each individually named defendant:

13. THE ESTATE OF JAMES W. BOONE, DECEASED THROUGH ROBERT R. BOONE, ADMINISTRATOR THEREOF—

Robert R. Boone gave his testimony by deposition taken on July 20, 1970. The deposition reflects that Robert R. Boone received a B.A. degree in economics from the University of Oklahoma; that he was 37 years of age at the time of taking the deposition; was a resident of Glendale, Arizona, and a life insurance salesman for the New York Life Insurance Company; that Robert R. Boone, son of James W. Boone, Deceased, was a director and cashier from September, 1960, until February, 1963, at which time he was requested to resign because of difficulties in connection with writing credit life insurance on certain loans and collecting premiums on certain items of account. Since February, 1963, he has had nothing whatsoever to do with the operation of The Bank.

Robert R. Boone was appointed administrator of the estate of James W. Boone, Deceased, in September, 1968, and very soon thereafter, in a general way, made all of the assets of the estate of James W. Boone available to the plaintiff and third party plaintiff and cooperated in every way possible to adjust the rights between plaintiff and defendant estate. The defendant estate makes no specific denial of any liability of the estate to the plaintiff or third party plaintiff, but simply makes a general denial of liability, and the Court finds no evidence on behalf of the estate of James W. Boone denying any claim of plaintiff.

Robert R. Boone did not at any time know of any illegal forgery or fraudulent acts of his father, and upon receiving word, while in Arizona, of the troubles of his father, he came home and prevailed upon his father to have confidence in him and tell him about his troubles. The father did not completely disclose his problems to Robert, but left a letter which is known to the record in this case wherein he made certain confessions and admissions of forgery, embezzlement and illegal banking activities.

Upon his arrival at his father's home in Tonkawa, according to Robert, the following took place: (Tr. 58)

" * * * we just sat down at the kitchen table and I said 'Bring me up to date so I can go down and work with these folks and let's get this done as quick as we can' and at that time my approach to it was just to let me know everything you can that's wrong so I can help them locate it and the quicker they find it the quicker they'll be out of there and do something with it, so we sat down at the table and he started telling me that he had gotten monies in various and sundry ways. I don't remember that we talked about forged notes at that time, * * * * "

The Court finds that James W. Boone, during his lifetime, forged the names of Robert R. Boone and that of another son, Richard L. Boone, and had secured money on such forged signatures and

used the money for various and sundry purposes, passing the notes to various correspondent banks, particularly the First National Bank of Braman, Oklahoma, which was controlled by James W. Boone.

The Court finds and the record is replete that James W. Boone, by devious means and methods, performed numerous violations of banking laws and customs, including the forging of various names to financial statements and notes and selling them to various correspondent banks and then passing these notes off to other correspondent banks with similarly forged notes and financial statements. Thus, most if not all of the forged notes were not in the notecase of the bank for examination by the officers and directors, the bank examiners and the certified public accountants.

The record is clear that Tonkawa Leasing Corporation was a Boone family owned corporation whose business was buying all kinds of equipment, including heavy duty equipment and small office-type equipment, furniture, fixtures, etc., and leasing such equipment to various lessees. It was well known that Tonkawa Leasing Corporation maintained its bank account with The Bank of Commerce and was one of the vehicles through which fraudulent, illegal bank activities were manipulated by James W. Boone, president and director of The Bank. It is well known that Tonkawa Leasing Corporation had leased to The Bank numerous items of furniture, fixtures and equipment; however there is no proof that such rentals were exorbitant or detrimental to the business interests of The Bank. The record is further clear that James W. Boone during his lifetime had rented post office boxes in cities other than Tonkawa in the names of various persons, whose names were used in forged and fraudulent documents and notes and were used as addresses at which to send statements or notices of due dates for payments on the items.

14. Richard L. Boone (Not a Defendant in this Case)—

Richard L. Boone, a son of James W. Boone, Deceased, gave his testimony by deposition September 25, 1970. The deposition reflects that at the taking of the deposition Richard L. Boone was 33 years of age; a resident of Sand Springs, Oklahoma; that he was a 1961 graduate of the University of Oklahoma with a masters degree in geology; that he worked for McMichael Concrete Company as a geologist and owned a drugstore, which his father loaned him the money to buy; that he worked a couple of months in The Bank while still in school, but knows nothing whatsoever about any of The Bank's operations, nor was he aware of the fraudulent and dishonest acts of his father; that he did own some stock in Tonkawa Leasing Corporation and a few shares of stock in The Bank; that he sold 10 shares of The Bank stock to Richard McKenzie leaving him with 4 shares. He had no investments with his father and no account with The Bank at Tonkawa; that it is evident his father signed his name to documents without his knowledge or consent, upon which money was secured, but not to Richard's benefit.

Richard L. Boone examined Plaintiff's Exhibits 1–A through 1–MM and many other documents, with one or two exceptions, all of which are forged. (These documents are attached to the deposition of Richard L. Boone.)

15. DEFENDANT ROBERT N. COLOMBE—

Robert N. Colombe gave his testimony by deposition August 19, 1970, and testified before the Court on August 14, 1972. His deposition reveals the following information: Mr. Colombe was a director of The Bank from August 3, 1956, until September 25, 1968, and did not ever serve as an officer; that he was the attorney for The Bank though he did not do all of The Bank's legal work; that at the time of taking his deposition he was 49 years of age; was a member of the Oklahoma Bar and had been a practicing attorney in Tonkawa for 16 years.

He testified that many loans were made by the loan officers of The Bank before the loans were approved by the Board of Directors, but such loans were made to the regular customers; that most of the new loans were never made until after approval by the Board of Directors; that the Board met regularly each month and discussed the loans and discounts which were in questionable positions, approved overdrafts and caused proper action to be taken. (Tr. 17)

"Q. When did you first become acquainted with the details and particulars or a particular loan which had been made or agreed to be made?

A. I suspect the first formal meeting would have been at the Board of Directors or the Discount Committee.

Q. Tell us how that was handled by the Board if there was a usual practice in connection with it.

A. Mr. Boone would either have applications there or would have notes and he would review the applications or the notes with the Board. If he had an application for a new line of credit the Board would generally discuss it with him and either give its approval or disapproval or suggest that they not, for example, take on certain parties or lines of credit and if it was an old customer so to speak and they had a loan there, why generally they had gone ahead and made the loan and the Board would approve it."

(Tr. 26, 27)

"Q. Now, when a loan was made by one of the loan officers I believe you stated it was subsequently submitted to the Board of Directors in a formal meeting for approval.

A. Well, I don't know that they all were, but we assumed that.

Q. You knew that was the customary practice?

A. That was the custom.

Q. And I assume that you assume that they were all presented?

A. Yes, we assumed they were.

Q. But you don't know whether they all were or not?

A. No, that's right.

Q. Do you have any knowledge at this time of any—

A. I might say this, John.

Q. Go ahead and explain anything you want to.

A. Well, I might say this with regard to the loans after seeing this, I'm certain that some of them were not.

Q. You learned that too at the meeting which the corporation had immediately preceding the closing of the bank?

A. Yes, we learned those things at that time.

Q. All right. Did you at any time knowingly vote to approve or approve any false or spurious or forged notes or obligations to the bank?

A. No.

Q. So that if there were any such you're reasonably sure they were not presented to the Board of Directors, is that correct?

A. That would be so.

Q. Do you have any knowledge, Mr. Colombe, at all of the affairs of Tonkawa Leasing Corporation in connection to the Bank of Commerce?

A. No."

The following line of questioning pertains to the granting of excess loans. (Tr. 61)

"Q. Do you have any memory of any of these (excess loans) being presented to the Board of Directors?

A. Well, there were at times discussions about like, you know, for example, some of these people who would want to borrow more than say $30,000.00, say maybe they wanted to borrow $40,000.00, the bank would take $30,000.00 and discount it.

Q. The bank might take it all and transfer it?

A. The mechanics I don't know about.

Q. You don't know anything about the mechanics of it?

A. No.

Q. As in any event that was handled as an administrative matter by the officers and not by the Board of Directors?

A. I just don't know."

The following line of questioning pertains to The Bank's policy with regard to collateral security. (Tr. 73, 74, 75)

"Q. Was it a deliberate design of the officers of the bank to take collateral security which was composed of both real estate loans and personal property loans, the real estate loans being appraised and the personal property loans not being appraised for the purpose of avoiding the statutory limitations?

A. No, John, that's not correct.

Q. You didn't think that was a policy of the bank?

A. No, the thing that—

Q. Take your time to consider that answer because it is important.

A. In the FDIC files of 1967, I refreshed my memory on that, the FDIC objected to the fact that we inserted in the mortgage form a statement to the effect that this mortgage covered not only the secured indebtedness herein but all indebtedness that is now owed or shall be hereinafter acquired.

Now, the examiner took the position that—well, the examiner took the position that when the total indebtedness exceeded the value of the real estate that the real estate mortgage was an excessive loan and I at that time briefed the Oklahoma law on that and I wrote a letter to the bank and sent a copy to FDIC and I advised the bank to continue to include that in the real estate mortgage forms for their own protection, notwithstanding the objections of FDIC.

Q. Because you felt that legally if you had a blanket coverage of personal property which was unappraised nobody could claim that you had exceeded the maximum limit of the statutes because your appraisal of the real estate did not justify the loan, isn't that true now, Bob, candidly, isn't that so?

A. No, I don't agree with that.

\* \* \* \* \* \*

A. Well, as I cited to the bank at that time, John, I believe the cases say that if it's a prime matter, if it was primarily made with regard to a real estate loan then it would be, it would come within the percentages of real estate loans, but where it was not primarily so, for example, I think one of these is a Mr. Sipe, he owed money on machinery and combines and all that kind of thing and well, it went bad, so consequently the personal property would continue to depreciate and that would make more coverage by the real estate and then when you compare later after the loan perhaps had gone sour, after you would compare then the value of the real estate as against the personal property it would look like it was in excess, but at the time it was made it wouldn't have been."

Mr. Colombe testified in person before the Court on August 14, 1972, as follows:

"Q. Will you tell the Court how you went about reviewing the notes?

A. I would say that for the most part, the president of the bank, James W. Boone, he would set at the head of the table, much as a table like that where Billy King is now sitting, and he would have the previous week's notes or applications for loans in his hand, and a little portfolio of some kind; and then he would review those notes. He would go through those notes and state to the directors the amount of the notes, the parties that had made the notes, and then if there were applications for loans, that is

those where notes had not already been made, then he would review the application, the name of the fellow and how much he wanted, and what it was to be used for and things of that kind.

Q. Would you discuss security and collateral?

A. Yes.

\* \* \* \* \* \*

Q. With regard to the forged notes, I refer to as alleged forgeries, but forged notes—with regard to them, what did you ever know about them and when and if you found out something, how did you find it out?

A. The first knowledge that I had of them, Mr. Northcutt, was at the time that Mr. Scheer, and I believe he testified as to the time he came there; it was either on a Thursday or a Friday, I can't recollect, he called the directors to come down to the bank one evening, if I remember it and I think I well do, that he called us down there and presented us a note there that had apparently the signature of Mr. W. J. McAninch on the note, and he said that was a forgery.

\* \* \* \* \* \*

Q. Now go ahead and tell the Court when you first became aware of forgeries.

A. It's when Mr. Scheer, the Bank Examiner, came and he made a call that evening, if I recollect properly, that he asked the Examiner—that the directors meet in a special meeting at the bank that evening, and we met there at the bank that evening, on Thursday or Friday. I don't recollect just which date; and so he had us come in there and he said, 'We have a note here', and Mr. McAninch's name appeared on it, and he said, 'This is a forged note.' And of course none of us believed it.

Mr. Scheer made the remark, 'Well, I know it's a shock to you and you don't believe it, but we have here a statement of Mr. McAninch saying that it isn't his signature.'

\* \* \* \* \* \*

Q. Do you recall anything at any time during your tenure as director up until that Thursday or Friday afternoon that would make you suspicious of any forgeries?

A. No, sir.

\* \* \* \* \* \*

Q. All right, just tell the Court your estimate of the man (James W. Boone) during your tenure that you used as a basis for dealing with him.

\* \* \* \* \* \*

A. Well, Mr. Boone came to town with his wife and three boys, and he was a very active churchman and went to church with his children. He was active in the Chamber of Commerce. As a matter of fact, his fellow townsmen elected him as the president of the Chamber of Commerce there at one time, and he was interested, I think primarily along with these other things that kind of rang the bell with me having been on the farm for some years, like the FHA boys and the boys on the farm, he'd give them little awards and take them and have kind of a little banquet for them; and he appeared to be a good man for the town."

The Court finds from the above recited testimony and other testimony and the exhibits and from all of the facts and circumstances in this case that the defendant, Robert N. Colombe, did not participate in any unlawful or dishonest conduct or deeds, was not negligent and is not guilty of dereliction of duty as a director of The Bank. The Court finds that the defendant, Robert N. Colombe had implicit, unquestionable faith in the honesty and integrity of James W. Boone, and that all of the losses of The Bank were directly and proximately caused by the dishonest and fraudulent acts of James W. Boone and no one else, and that the Estate of James W. Boone, and the Estate alone, is liable for such losses.

## 16. DEFENDANT H. K. "DUKE" COOK—

H. K. "Duke" Cook gave his testimony by deposition September, 1970, and testified before the Court on August 15, 1972. His deposition reveals the following information: That at the time of taking his deposition, he was 37 years of age; that he was a member of the Board of Directors from February 16, 1966, to September 25, 1968, and was also vice-president in charge of installment loans. He lived in Ponca City, Oklahoma, for three years before moving to Tonkawa, where he lived for three years. After terminating his employment with the Bank of Commerce when it closed, he was associated with the Service Bank of Tonkawa, the successor of the Bank of Commerce. After a short time he was employed by the National Bank of Warr Acres, Oklahoma, in the capacity of vice president in charge of installment loans and also handled the advertising and marketing.

While an employee of the Bank of Commerce, he was in charge of the installment loan department and made many small loans for The Bank. The customers would submit applications for loans, and he would make the usual investigation through the Retail Credit Bureau. The investigation would include checking the borrower's previous pay record; checking his employment and earning capacity, his character and other necessary facts to make a determination of creditworthiness. If the creditworthiness was proper he would make the loan; if not, he would submit it to the Board. In a case where he made the loan without submitting it to the Board, he would present such loan to the Discount Committee at their next regular weekly meeting and report his findings regarding the loan and would recommend that the Committee approve the loan, and in due time would likewise seek approval of the loan by the official Board at its next regular monthly meeting.

The other loan officers of The Bank were James W. Boone and John W. King who handled generally similar loans and local commercial loans. In his judgment 75 percent of the commercial loans were made after outside appraisal reports were made.

John W. King had the duty to prepare daily reports of the operations of The Bank, including all loans made by each of the loan officers of The Bank, and this report was passed around to each of the officers of The Bank for their information.

John W. King was secretary of the Discount Committee and James W. Boone was the chairman, president and executive manager, and he would present the notes to the Committee for their consideration and recommendation, which is the same as he would do in the meetings of the Directors of The Bank. He would call off the notes that had been made and discuss the worthiness of the borrower and then the Discount Committee would vote to approve or disapprove the loan. If the loan had not already been made by the officer, authority would either be given or not, as the Board thought proper. The Court finds that no minutes of the meetings of the Discount Committee were made.

At the Board meetings the notes were not passed around for each director to handle and peruse, but were always retained by James W. Boone, and it appears now from the information received at the closing of The Bank that Mr. Boone did not present all of the notes to the Board for their consideration, but rather that many loans were made without the knowledge, consent or approval of the Board of Directors.

The evidence shows that each of the Board members was paid $50.00 a month, which normally was paid in a lump sum twice a year. The Board met regularly and passed upon the loans, approved the overdrafts and directed the operation of The Bank.

The record reveals that James W. Boone never at any time consulted Mr. Cook about any loans that he made.

Mr. Cook stated that he did have knowledge of the overdrafts, and as checks came in creating overdrafts, they were handled by Mr. Boone or Mr. King. If the overdraft was allowed, the customer was contacted and the deposit was made without any unnecessary delay. If not allowed, it was sent back. Overdrafts were allowed only when there was good cause.

Each week Mr. King would make up a list of the delinquent commercial loans and Mr. Cook would make up a list of the delinquent installment loans, and copies of these reports were sent to Mr. Boone.

Mr. Cook stated that during the period he was on the Board it never came to his attention that there were excess loans made in violation of the Oklahoma Banking Code and loans which did not comply with the requirement for security as laid down by the Oklahoma Banking Code.

Mr. Cook knew of the existence of the Tonkawa Leasing Corporation. He knew it had an account at The Bank, but he had nothing to do with the deposits or withdrawals of the account. The only thing he ever did in connection with the account was to occasionally make a deposit to Tonkawa Leasing Corporation's account when an installment payment was received.

Mr. Cook examined FDIC Exhibit F–1 and all of the documents attached thereto and stated that this was the first time he ever saw any such documents or knew anything about the loans therein referred to, which were made by James W. Boone without the knowledge of Mr. Cook. Mr. Cook stated that he knew nothing about Item 15 on page G–7 (Plaintiff's Exhibit), several notes amounting to $57,806.05 belonging to Thurman R. Loyd. He stated that he did not know Mr. Boone and Mr. Loyd were associates, but that he had seen Mr.

Loyd come into The Bank occasionally to visit with Mr. Boone.

Mr. Cook stated that the delinquencies at The Bank ran less than 1 percent, and that is good according to the banking standards across the country. Sometimes delinquent accounts were brought up at the Directors meetings when they were having trouble with them. When asked about the Bob Sipe loan made by John W. King, Mr. Cook stated that Mr. Sipe was a combine operator, working only periodically; that he had some hard luck and that The Bank was having trouble with his loan, which worried all of the officers and directors.

Mr. Cook testified in person before the Court on August 15, 1972, and the following information was revealed:

Mr. Cook stated that he was in The Bank daily except when on vacation or away on business and that he saw Mr. Boone nearly every day; that his desk was in a position where he was able to see Mr. Boone's office and any visitors Mr. Boone might have. Mr. Cook stated that he never saw anything happen to make him suspicious of any wrongdoing.

His testimony shows that he first discovered the forged notes on September 13, 1968, when Mr. Scheer came in, and that was when he first discovered large notes out of the territory and some so-called fictitious notes that had not been approved by the Board.

The Court finds from the above recited testimony and other testimony and the exhibits and from all of the facts and circumstances in this case that the defendant, H. K. "Duke" Cook, did not participate in any unlawful or dishonest conduct or deeds, was not negligent and is not guilty of dereliction of duty as a director and officer of The Bank. The Court finds that the defendant, H. K. "Duke" Cook, had implicit, unquestionable faith in the honesty and integrity of James W. Boone, and that all of the losses of The Bank were directly and proximately caused by the dishonest and fraudulent acts of James W. Boone, de-

ceased, and no one else, and that the Estate of James W. Boone, and this Estate alone, is liable for such losses.

### 17. DEFENDANT JOHN W. KING—

Defendant-Director John W. King gave his testimony by deposition August 18, 1970, and testified before the Court August 14 and 15, 1972. Mr. King's deposition reflects the following information: that at the time of taking his deposition Mr. King was 46 years of age; that he served in the Air Corps during World War II and had a long banking history before coming to the Bank of Commerce in 1950; that his connection with The Bank continued until its closing September 25, 1968; that he served The Bank in the positions of teller, assistant cashier, vice-president, cashier and senior vice-president; that he graduated from the Tonkawa public schools, attended Northern Oklahoma College at Tonkawa and later graduated from the University of Oklahoma with a BA in business and government, where he had courses in banking and accounting.

Mr. King testified that he was on the Discount Committee which met once a week and passed upon loans which had been made and were to be made and took action on every other matter coming before the Discount Committee. The Discount Committee was made up of directors who lived in or near Tonkawa, Oklahoma, and who could attend the weekly meetings. Each loan officer would make his own loans and his own appraisals, except when he felt an outside appraisal was necessary. Many of the directors and officers knew the land values in the banking area and the expense of an outside appraiser was often unnecessary. It is true that the directors generally accepted the statements and recommendations of the loan officer regarding the borrower and whether or not he was a good credit risk, and many loans were approved by the Board upon the recommendation of the loan officer.

John W. King stated that his relationship with James W. Boone was that of employer-employee; that they had some business adventure in that Mr. King had purchased some stock in a stock club and purchased some oil minerals in Noble County and invested $500 in some stock in R–P Company, a pharmaceutical company. Mr. King stated that he knew of the Tonkawa Leasing Corporation and that it was owned by the Boone family. All of the assets of Tonkawa Leasing Corporation were handled by Mr. Boone. He knew of the leases made by The Bank from Tonkawa Leasing Corporation with reference to equipment, furniture, fixtures, etc.; that he made no analysis of the Tonkawa Leasing Corporation bank account; that is, deposits to the account or checks drawn on the account.

The following questioning regarding presentation of notes to the directors is reflected at Tr. 77, 78.

"Q. The first thing I wanted to clear up with you is I understand that possibly inadvertently you may have incorrectly answered a question which I asked you about presentations to the Board of Directors of the Bank of Commerce of all notes and credit obligations which were in formal form and as I recall it you said, yes, they were all presented, and what is now the true fact about that, if the answer which you gave needs some modification you may make it now because I do not wish to put you in a false position at all.

A. I assumed at the time that they were all presented.

Q. You thought from week to week and month to month that all notes and credit obligations of the debtors were being presented to the Board of Directors for its consideration and approval?

A. That's right.

Q. But at the present time you have found out that that is not true?

A. Yes.

Q. And that some of them at least were not so presented to the Board?

A. Yes.

Q. That is the statement that you now wish to make?

A. Yes."

With reference to transfer loans, the following questioning is reflected at Tr. 117.

"Q. And in the case of all except excess loans or loans which would be excess if retained, James W. Boone determined which notes would be transferred and to whom?

A. Yes."

*    *    *    *    *    *

"Q. Was any formal record made of any transfer agreement of any kind other than just the transfer of the notes with the Bank of Commerce endorsement on them?

A. No formal record that I know of.

Q. Were those notes which were transferred actually endorsed by the Bank of Commerce?

A. Yes.

Q. Without recourse?

A. Yes.

Q. Suppose in the case of fraudulent loans, was there recourse on those from one bank to another?

A. I assume there would be. They wouldn't accept it if it wasn't endorsed without recourse I wouldn't think."

The following questioning relates to the microphone arrangement at The Bank and is reflected at Tr. 120, 121.

"Q. Mr. King, did you ever have any knowledge of the fact that Mr. James W. Boone maintained microphone connection with other offices in your bank?

A. No.

Q. Did you ever participate on any listening arrangement on that microphone arrangement?

A. No.

Q. Either prior to the time the bank closed or subsequent thereto?

A. No.

Q. As far as you know there never was any equipment installed in the bank through which in one office where something occurred that Mr. James W. Boone in his own office could listen and hear what was going on?

A. No, I sure didn't.

Q. Have you since learned of the existence of that?

A. Yes.

Q. When did you discover it?

A. Mr. Trueblood told me.

Q. How long after the bank closed?

A. He told me, oh, about I'd say two or three months ago or something like that."

The following line of questioning relates to various loans at The Bank and repayment thereof and is found at Tr. 140.

"Q. Did you at any time while you were cashier of the bank know that there were note obligations of Thurman Loyd in the bank's note case totalling some $57,806.05?

A. No. I knew he had notes there, but nothing like that.

Q. Did you know that Loyd was connected with Engineered Plastics Sales, Inc., which I mentioned previously?

A. No. The R–P organization was what I had him tied in with.

Q. Did you know that he was also interested in Nordam, Inc.?

A. No.

Q. Did you ever know or learn that J. W. Boone made principal and interest payments on the Loyd loan and the notes of P. G. Adair and Hyatt?

A. No.

Q. You didn't know that at all?

A. No."

Though defendant, John W. King, was the cashier and senior vice president, he did not know of the many unapproved loans and the many forged loans charge-

able to The Bank. He did not know that James W. Boone was hiding anything from him or the other directors. As senior vice president and cashier, he did not participate in any way in making any false, spurious, forged or fictitious notes. He did not ever have knowledge of any false, spurious, forged or fictitious loans in The Bank records or in the notecase.

Defendant John W. King testified before the Court on August 14 and 15, 1972, as follows:

That he was familiar with the custom of banking operations in Tonkawa and Kay County, Oklahoma, wherein the directors did not physically examine every note and signature on the notes in The Bank; and that it was not the custom of directors or officers in the Bank of Commerce to examine every note, signature and signature card and make investigations from time to time to see if there was forgery on their notes.

The record shows that as cashier and senior vice president Mr. King did have access to the books and records, but did not ever have access to the forged notes or the records relating to the extra-territorial notes and foreign notes which were in the possession of James W. Boone and to the exclusion of the Board.

The following line of questioning at the hearing before the Court relates to the Discount Register and notecase kept by The Bank and is found at Tr. 28, 29, 30:

"Q. All right, and who put the entries in that book up there?

A. Mrs. Heltzel would be the, general bookkeeper known as.

Q. And what is the purpose of that book?

A. Primarily it's to assign the loan a number.

Q. And have a record by numbers, is that right?

A. Yes.

\* \* \* \* \* \*

Q. Then is it your testimony that the purpose of it is to give a listing in chronological order?

A. Yes, I would say so.

Q. How do you file the notes in the note case?

A. They would be alphabetical.

\* \* \* \* \* \*

Q. Now what happened to that note after it got in the note case; did it ever get any more attention from anybody?

A. Well, we would go through and check the maturity dates and as they neared, notices would be prepared and mailed out to the customer.

Q. All right, and suppose you had trouble with somebody, they didn't pay; what happened?

A. There would be a follow up.

Q. Who would follow it up?

A. It would be the officer that made the loan.

Q. Then would it be fair to say that if Mr. Boone had somebody in there that he made the loan to and it became delinquent that he either would get you to do it or he would do it himself?

A. Yes.

Q. And you and Mr. Cook likewise?

A. Yes.

Q. All right. Did you ever have any delinquencies show up on any of these fictitious notes that you know of?

A. Not to my knowledge, no.

\* \* \* \* \* \*

Q. And what is the purpose of this discount book?

A. My thought primarily it assigns a note number to the note.

Q. Is that the only purpose for it?

A. Well, we don't use one where I am at now, a particular register like that, but we have to assign a number to the note. We use another method."

The Court finds from the above recited testimony and other testimony and the exhibits and from all of the facts and circumstances in this case that the defendant John W. King did not partici-

pate in any unlawful or dishonest conduct or deeds, was not negligent and is not guilty of dereliction of duty as a director and officer of The Bank. The Court finds that the defendant John W. King had implicit, unquestionable faith in the honesty and integrity of James W. Boone, and that all of the losses of The Bank were directly and proximately caused by the dishonest and fraudulent acts of James W. Boone and no one else, and the Estate of James W. Boone, and this Estate alone, is liable for such losses.

18. DEFENDANT W. J. KING—

Defendant-Director W. J. King gave his testimony by deposition November 2, 1970, which deposition reflects the following information: that he was a director of The Bank from January 9, 1951, until September 25, 1968; that at the time of giving his deposition he was 89 years of age; that he had lived near Tonkawa since 1889, and the evidence shows that he was selected as a director because he knew many of the farmers in the territory and provided advice to the other directors regarding the reliability and creditworthiness of the farmers who applied for loans.

The Court finds that he knew nothing about the loans, discounts, forgeries, excessive notes, overdrafts, etc.; that he is very old and feeble and it is doubtful he should ever have been serving as a director of The Bank. His testimony is not helpful to the Court in deciding the issues of liability or non-liability of the directors because of his incompetency.

When asked if he ever asked Mr. Boone anything concerning any of the loans he stated that he never did make any inquiry of Mr. Boone with reference to any loan; that he did not know anything about Tonkawa Leasing Corporation though he had heard of it, but did not know that Tonkawa Leasing Corporation had an account with The Bank; that he did not know of any of the items referred to in Plaintiff's Exhibit F–1 and G–1, which contain all documents relating to bank transactions of Tonka-

wa Leasing Corporation; that he did not know anything about notes not passed upon by the Board of Directors at their monthly meetings.

The Court finds from all of the evidence presented in this case that the defendant, W. J. King did not participate in any unlawful or dishonest conduct or deeds, was not negligent and is not guilty of dereliction of duty as a director of The Bank. The Court finds that the defendant, W. J. King, had implicit, unquestionable faith in the honesty of James W. Boone, and that all of the losses of The Bank were directly and proximately caused by the fraudulent acts of James W. Boone and no one else, and that the Estate of James W. Boone alone is liable for such losses.

19. DEFENDANT RICHARD I. McKENZIE—

Defendant-Director, Richard I. McKenzie, gave his testimony by deposition November 2, 1970, and testified before the Court on August 14, 1972. Mr. McKenzie's deposition reflects the following information: That at the time of his deposition he was 47 years of age; that he was born in and lived around Tonkawa all of his life; was in the military service from 1942 until 1946 serving primarily in Venezuela; that he received his bachelor's degree in accounting from Oklahoma State University and is now in the insurance business and does some accounting and tax work; that he became a director of The Bank at the termination of Robert R. Boone as director in 1963 and served until The Bank closed September 25, 1968. During the time Mr. McKenzie served The Bank as director he was never an officer.

Mr. McKenzie stated that he felt the weekly discount meetings were equivalent to the monthly board meetings, and that the primary duty at each meeting was to review notes and assist the loan officers upon request. He stated that Mr. Boone, as managing officer, at the Board meetings would present the notes to the other members and bring up any

business that needed to be discussed; that there was always discussion regarding certain assets of The Bank and what should be done with them. At the Board meetings as Mr. Boone would go through the notes if any director had any discussion or opposition they would discuss it and if additional information was needed, either Mr. Cook or Mr. King would leave the meeting and secure the information. Whether or not there was discussion depended mainly on who the borrower was; if they knew the borrower and that he had collateral and had not reached his line of credit, there would be no discussion. There was only discussion on the ones in doubt that they felt needed discussing, such as when a new customer whom the loan officer did not know came into The Bank for a loan. Then the loan officer would secure financial statements and Retail Credit Reports to assist him. This information would then be presented to the Board for discussion. Mr. McKenzie did in fact make opposition on occasion to some of the loans which had already been made before presentation to the Board, but stated that when you have 7 or 8 people working together, they will not always agree.

Mr. McKenzie stated that he knew The Bank leased some items from Tonkawa Leasing Corporation, but other than that knew nothing of the operation of Tonkawa Leasing Corporation, except that it was a wholly owned James W. Boone family corporation. The items in Plaintiff's Exhibits F–1 through F–8 and G–1 through G–8, representing loans made by the Bank of Commerce and deposits to the Tonkawa Leasing Corporation, were shown to Mr. McKenzie who stated he knew nothing about such documents. He also stated that the affairs of Tonkawa Leasing Corporation were never discussed at the Board of Directors meetings.

Mr. McKenzie stated that he never at any time knew of any forged or excessive notes which had not been presented to and discussed by the Board of Directors until they were revealed by the bank examiner just before the closing of The Bank. Mr. McKenzie stated he had no idea that all loans were not being presented to the Board for discussion, review or approval.

Defendant Richard I. McKenzie testified before the Court on August 14, 1972, as follows:

"Q. And the out of territory loans; when did you first hear about them? I'm talking about these big loans that are listed here on this exhibit.

A. The following day when Mr. Scheer gave us a list of the notes and informed us they were to be liquidated.

Q. Were you ever aware of the existence of those until that day?

A. No.

Q. Had you attended the weekly meetings regularly?

A. Yes.

Q. Did you have anything arise in connection with the operation of the bank or any of the individuals in it that excited your suspicions in any way that some of these things might be true?

A. Never."

The Court finds from the above recited testimony and other testimony, the exhibits and from all of the facts and circumstances in this case that the defendant, Richard I. McKenzie did not participate in any unlawful or dishonest conduct or deeds, was not negligent and is not guilty of dereliction of duty as a director of The Bank. The Court finds that the defendant, Richard I. McKenzie had implicit, unquestionable faith in the honesty and integrity of James W. Boone, and that all of the losses of The Bank were directly and proximately caused by the dishonest and fraudulent acts of James W. Boone, and no one else, and that the Estate of James W. Boone, and this Estate alone, is liable for such losses.

## 20. DEFENDANT LIN TRUEBLOOD

Defendant-Director, Lin Trueblood, gave his testimony by deposition August 19, 1970, and testified before the Court on August 14, 1972. Mr. Trueblood's deposition reflects the following information: That at the time of giving his deposition he was 54 years of age; that he was a director of The Bank from January 5, 1960, to September 25, 1968; that he was never at any time an officer of The Bank. He was and had been the manager of the Federal Land Bank at Ponca City, Oklahoma, for 15 years and had some cattle. He lived on a farm near Tonkawa where he had lived for 30 years; that he graduated in 1939 from the University of Oklahoma with a bachelor's degree in business administration. He testified that he and his family had done business with The Bank since 1913. Mr. Trueblood stated that he attended nearly all of the weekly Discount Committee meetings and at the meetings they would discuss the line of credit on loans and the credit worthiness of persons to whom loans were made. The Bank served Kay, Osage, and Noble Counties, and the directors pretty well knew the people in the immediate area.

With reference to procedure of loan approvals at the Board meetings, Mr. Trueblood stated that unless there was something extraordinary about the loan they did not examine the loan packet. In other words, if the loan was not excessive and they had no question about the person and his security, then they did not question it. He felt that where you have short term lending you must, when deciding to extend a loan or not, consider the individual himself, but that there would, of course, be a limitation to what a man could borrow. For instance if a person was on a small salary, he would be limited, but if one of the good farmers in the area came in for a $10,000.00 loan and they knew his line of credit, then they would not question it; but stated that he understood it was the loan officer's responsibility to get the information. He stated that the

loan officers were H. K. "Duke" Cook, John W. King and James W. Boone and that he had utmost trust in them.

The evidence is clear that The Bank had had a CPA firm which audited the books and records once a year, and if as a result of the audit there was any question about a loan, the loan officer who made it would present any information which was requested.

Mr. Trueblood's testimony shows that James W. Boone always brought all of the notes to be discussed at the meeting in a portfolio and would present the ones he wanted to present for approval. When he had gone through the complete packet of notes, none of the directors, including Mr. Trueblood, asked if that was all of the notes because they assumed it was.

Mr. Trueblood stated that Mr. Boone made primarily all of the large loans, and when asked what requirements were made on extensions of loan periods he stated that they discussed these matters at the Board Meetings and made sure the security was ample to cover the loan. If there was a borrower who was not strengthening his position, then they discussed it and made recommendations. He stated that they discussed many people, had many problems, and solved all problems that they knew about, but that it was impossible to solve problems they were in the dark about.

When asked what he knew about Tonkawa Leasing Corporation, he answered as follows at Tr. 28, 29, 30:

"Q. Were you familiar with Tonkawa Leasing Corporation?

A. No.

Q. And you didn't know who the officers of that corporation were?

A. No, nothing about it, the only think I knew about that was that when he formed it and I visited a little bit with him about that then because he—

Q. Excuse me, but when was this, sir?

A. I can't remember.

Q. Approximately, was it a few years ago or what?

A. The only thing I could do is go back and check. One of the purposes of it was we were financing Atlas Tank and this was a terrific worry to me and I know it was to the other Board members, the thing was too big for us and at that time he (James W. Boone) came to the Board and said that he was forming this company and the conversation I had was after this Board meeting and he said he would form this leasing company and that he would buy the assets, I mean the machinery of the Atlas Tank Company and then lease it back to them and by leasing it back by the month and their paying it monthly, then that would release the money for them to have for operational purposes and it would put them in a much better credit position and this I was in favor of because I felt like that it was something that we should not be in and then I asked him, I said, 'Jim, how do you know that what Tonkawa Leasing Corporation pays for this equipment, how do you know it's worth that?', and he said he didn't care, that it was transferred off over the years, it would charge off, and at the end of ten years he would give it to them and this is the only thing that I ever discussed with him about it."

Another problem the directors had was with Mr. R. C. Sipe and in this connection the defendant Trueblood stated as follows at Tr. 36, 37.

"A. R. C. Sipe is a fellow who was my neighbor incidentally, he lived across the road from me and he had a preference right lease of the Oklahoma School Land Commission and originally the way we got started with Bob was this was used as security for Bob. He inherited this from his family and this was used for security and he borrowed money on this to buy a house in town I believe. He's a real poor manager and he got in financial difficulty over some combines, he is a custom combiner too, so what he did,

he eventually sold the preference right lease for $18,000.00 and at that point I thought we shucked him, I thought that this went to pay off what his indebtedness was to the bank and it appeared later that Jim didn't do this.

Q. You were not aware that there was a loan outstanding of over $2,500.00?

A. It was more than that. He's listed two or three times, I think it's an aggregate of $17,000.00 or $18,000.00, but I was amazed that it was that much.

Q. And you say that his lease right or real property right there was supposed to have been used to secure the loan?

A. Yes."

Defendant, Lin Trueblood, testified before the Court on August 14, 1972, as follows:

"Q. Did you have anything happen which would raise your suspicion about large loans being made that you knew nothing about involving forgeries?

A. Not while the bank was in operation.

Q. And what was your feeling or reaction when you did find it out?

A. Well, when you have a good friend and all these things happen, why it's very disturbing thing, naturally; especially when you have had so much confidence in a person."

The Court finds from the above recited testimony, other testimony, the exhibits and from all of the facts and circumstances in this case that the defendant director Lin Trueblood did not participate in any unlawful or dishonest conduct or deeds, was not negligent and is not guilty of dereliction of duty as a director of The Bank. The Court finds that the defendant had implicit, unquestionable faith in the honesty and integrity of James W. Boone, and that all of the losses of The Bank were directly and proximately caused by the dishonest and fraudulent acts of James W. Boone, and

the Estate of James W. Boone and it alone is liable for such losses.

## 21. DEFENDANT BILLIE BOONE (MRS. JAMES W. BOONE)—

Mrs. Billie Boone gave her testimony by deposition on September 1, 1970 and testified before the Court on August 14, 1972. Her deposition reflects the following information: That she served as director and assistant cashier of The Bank from September 1, 1963, until September 25, 1968. That she was the wife of James W. Boone, deceased, who was the president and majority stockholder of The Bank. At the time of giving her deposition, she was 66 years of age; that after the death of her husband in 1968 she moved back to Atoka where she and her family lived before moving to Tonkawa. At the time of her deposition Mrs. Boone was renting a house in Atoka.

Mrs. Boone recalled signing the directors oath each year and stated that she worked in public relations for The Bank, meeting new people in town and inviting them to The Bank, and she planned social events at The Bank in order to promote good will. She attended the directors meetings the first year or two and then quit, as her husband told her it was not necessary that she attend. The minutes of the meetings were presented to Mrs. Boone and she read and signed them each month. She testified that she knew the other directors of The Bank very well and knew many of the customers of The Bank.

Shortly after her husband's death, Mrs. Boone received approximately $30,000 of a $50,000 life insurance policy with Kansas City Life. The reduced proceeds resulted from the fact that they had borrowed on the policy. She also collected $40,000 from the Equitable Life Insurance Society of the United States, which she believed was a group policy carried through the Oklahoma Bankers Association. She also received $12,500 from Kansas City Life, which was also a group policy. She stated that she had difficulty collecting on the latter two policies.

Plaintiff's Exhibit F–1 and G–1 were presented to Mrs. Boone for inspection, and she testified that she knew nothing about the items set forth in such exhibits.

The evidence shows that Mrs. Boone knew nothing about the fraudulent notes of her husband and the notes which were never presented to or approved by the Board of Directors. She knew that her husband had bought controlling interest in the First National Bank at Braman, Oklahoma, and was president, but did not know what arrangements he made to buy the bank.

The Court finds from the testimony, the exhibits and from all of the facts and circumstances in this case that the defendant director, Billie Boone (Mrs. James W. Boone) did not participate in any unlawful or dishonest conduct or deeds, was not negligent and is not guilty of dereliction of duty as a director and officer of The Bank. The Court finds that the defendant, Billie Boone, had implicit, unquestionable faith in the honesty and integrity of James W. Boone, her husband, and that all of the losses of The Bank were directly and proximately caused by the dishonest and fraudulent acts of James W. Boone, and no one else, and that the Estate of James W. Boone, and this Estate alone, is liable for such losses.

## 22. DEFENDANT JOHN V. RICH—

Defendant-Director John V. Rich gave his testimony by deposition on September 2, 1970, and testified before the Court on August 14, 1972. His deposition reflects the following information: That he was a member of the Board of Directors from January 11, 1956, to September 25, 1968, and served as Vice President from January 10, 1961 to September 25, 1968. At the time he gave his deposition, he was 59 years of age and lived in Atoka, Oklahoma, which is about 150 miles from Tonkawa; that he served in World War II and in the Kore-

an War; that he received a B.S. Degree and an M.S. Degree in the study of agriculture from Oklahoma State University; that he has been employed by the Department of Agriculture since 1934; that he and James W. Boone purchased the Bank of Commerce at Tonkawa in late 1955. At the time of the purchase he owned 215⅓ shares. Since that time he has sold a few shares, and at the time of The Bank's closing he had an investment in The Bank of $56,000. Soon after he was made director, he attended director's meetings fairly regularly and in early 1960 he had a heart attack and shortly thereafter on the advice of the doctor he attended the directors meetings less regularly, and would get his information about the meetings from Mr. Boone when they visited. From time to time the minutes were mailed to him at Atoka to be signed and returned. Mr. Rich did not belong to the Discount Committee.

He knew of the existence of the Tonkawa Leasing Corporation and that it purchased equipment, machinery, fixtures, etc. and in turn leased them, but he did not know that Tonkawa Leasing Corporation had an account with the Bank of Commerce, nor did he know about any of its business affairs.

Mr. Rich stated that he became well acquainted with James W. Boone just after World War II; that their families were close and that they had some business relations in Atoka.

Mr. Rich testified that James W. Boone was an outstanding Baptist Church Deacon; that he tithed regularly; that he was a Sunday School teacher and superintendent of the Sunday School; and that he took part in all of the community affairs in Atoka; that he had an irreproachable reputation for honesty, veracity and integrity.

The following line of questioning regarding the general business of The Bank is found at Tr. 72, 73:

"Q. Based upon the reports you received from time to time, Mr. Rich, can you tell us how the profit picture of the bank was from 1955 and subsequent years?

&ast; &ast; &ast; &ast; &ast; &ast;

A. We felt like the earnings of the bank was very good and that the management, from our standpoint, we felt like the management as far as Mr. Boone was concerned, we felt he was a very dynamic person and was doing a good job in the bank and that the earnings would appear to be within the limits of most other banks in the area approximately.

Q. Based upon your previous knowledge of Mr. Boone in Atoka and based upon the progress on the Bank of Commerce in Tonkawa after he went there, did you ever at any time have anything come up that caused suspicion, alarm, apprehension or worry regarding the operation of the bank?

&ast; &ast; &ast; &ast; &ast; &ast;

A. No, there was not any time to my knowledge up until the fourteenth day of September that I had any doubts about the operation."

Mr. Rich examined Plaintiff's Exhibits F–1 and G–1 through G–8 and stated he had not seen any of the items contained therein until after The Bank closed.

The following line of questioning relates to Mr. Rich's concern with The Bank and is found at Tr. 52, 53:

"Q. Mr. Rich, what efforts, if any, did you make as a Director of the Bank of Commerce to keep yourself currently advised concerning the status of outstanding loans?

A. The main effort of course I made was when I attended the Directors meetings and then in my conversations with Jimmy Boone, the President of the bank, and our relationship together when we visited with each other, it was the prime method of keeping up with it, primarily through the Directors meetings.

Q. Would it be a fair statement to say that that was probably the extent of your efforts on your part?

A. Well, I think that would be. I don't know whether you could say it in exactly those words or not because I had interest in it, I had a lot of money tied up up there and I was interested from that standpoint, that is in seeing that it was taken care of. Of course I didn't have any particular concern because I felt like the money was in good hands."

The Court finds from the above recited testimony, other testimony, the exhibits and from all of the facts and circumstances in this case that the defendant director, John V. Rich, did not participate in any unlawful or dishonest conduct or deeds, was not negligent and is not guilty of dereliction of duty as a director of The Bank. The Court finds that the defendant had implicit, unquestionable faith in the honesty and integrity of James W. Boone, and that all of the losses of The Bank were directly and proximately caused by the dishonest and fraudulent acts of James W. Boone, and the Estate of James W. Boone, and this Estate alone is liable for such losses.

23. The Court is impressed with the testimony of Mr. Roy E. Grantham before the Court on August 14, 1972. Mr. Grantham is an attorney who has practiced law in Oklahoma for more than 25 years. He was County Attorney of Kay County for a number of years and has been in the Oklahoma State Senate for more than 22 years representing Kay and Grant Counties, Oklahoma. He was a member of the Board of Directors of the First National Bank of Kaw City, which was moved to Ponca City, Oklahoma, when Kaw Dam and Reservoir was built, and when it was moved to Ponca City the name of the bank was changed to Pioneer National Bank. This bank had a base of between nine and ten million dollars.

He attended a school for directors held at Colorado Springs, Colorado, in 1958 or 1959, and he was familiar with the banking laws of the State of Oklahoma as they related to directors; that he was familiar with the custom, usage and practice with regard to various banking procedures. He stated that usually some of the officers within the bank are assigned as loan officers and those are the officers which make the loans in the bank; that the vast majority of the loans are made prior to directors' approval.

The following testimony was given by Senator Grantham before the Court on August 14, 1972, and he stated at Tr. 34–37:

"Q. What is the custom in Kay County and the State of Oklahoma regarding amounts of loans which may not be presented to the Board for approval?

A. That varies with the various banks. However, the general custom is that there is a cutoff figure that is more closely scrutinized above that figure than below.

As to whether or not the loan is called to the attention of the directors, it's usually a case where it is a large, an unusual loan that it would be called to the attention of the directors maybe prior to the time that the loan was made.

But in most cases this doesn't happen. The examination of the loan in detail, of all the loans in detail, will vary anywhere from, I'd say, $2,000 to $5,000 or $6,000, where you would scrutinize the loan more closely.

Q. All right, sir. Now what is the custom in Kay County and over the state of Oklahoma regarding methods of presenting the loans to the directors?

A. The usual method of presenting the loan to the directors works in the manner that first of all the discount committee goes over the loans, and the breakoff figure that I have spoken of, as used by the discount committee.

Say the breakoff figure is $5,000. The loans are all listed that transpired prior to the months previously, from the last discount meeting to this discount meeting under consideration, and all those loans are listed with a note number.

You go down the list of notes number by number and these numbers usually are the order in which the notes were written in the bank, and if you have a cutoff figure of $5,000, the president of the bank will have all the folders on the notes over that figure. When there is any question about any one of them, you talk to the president or the loan officer who made the loan, and when you come to the loan that is over this figure, the president has this out there or the chairman of the board in some cases, and they will tell you the details about this loan, what the collateral consists of, what this man's business is, what his net worth is, and so forth.

\*   \*   \*   \*   \*   \*

Q. Then do I understand that mainly they bring in a list typed up on a piece of paper?

A. It's a list, usually you will have maybe more than one list. You will maybe have installment loans in one list and you will have commercial loans in another list, but in any event you have a list and the note number is on that list.

Q. I will ask you whether or not there is any custom on the part of directors, when they hear this list read, to go to any ledger or any other record in the bank and verify it to see if the president is telling the truth.

A. Not to my knowledge.

Q. Have you ever heard of it?

A. Never heard of it, and I don't believe that it's done. You have hired a man to be in charge of the bank and you naturally trust and rely upon his judgment, and he has all the records in a folder, and if you have a question he usually opens the folder and reads to you from it rather than having the man on the discount committee or board read.

Q. I will ask you, Senator, whether or not you know of any custom or even have heard of any custom in Kay County or in the State of Oklahoma where the directors go to the signature cards and to the notes that have been signed and checked to see whether or not there is forgery.

A. Not to my knowledge.

Q. Have you ever heard of it?

A. No.

Q. Did you know Jim Boone?

A. Yes.

Q. Would you tell the Court his general reputation in the community and in our county?

A. His reputation was good.

Q. Church man?

A. Church man.

Q. Civic man?

A. Civic leader, worked in the Boy Scouts, worked as, served as chairman of the Democratic Party in Kay County one time, and I would, I would not have thought that Jim Boone would have done anything wrong."

24. In addition to Examiner Myron R. Scheer's report heretofore quoted and made a part of these findings, the Court refers to Mr. Scheer's testimony by deposition taken June 30, 1971:

(Tr. 111)

"Q. Did you determine from your examination over what period of time this forgery device had been going on; how long the forgeries had been in existence?

\*   \*   \*   \*   \*   \*

A. The further back you go in the records, the more vague something like this becomes, but I believe from the list of notes that we have or that you have, that you'd find that some are dated back a good number of years."

(Tr. 112)

"Q. Did the forgeries go back to 1955?

A. Well, sometime after he purchased the bank, I think.

Q. Shortly after he purchased it?

A. He may have started this active —

Q. In other words, from your examination you determined that this

pattern of forgeries began shortly after Mr. J. W. Boone acquired the bank?

A. Well, I don't like to use the term 'shortly.'

Q. Well, within a year?

A. I couldn't give you an actual period of time after he took over, but it was quite a few years prior to the discovery when he started this arrangement."

(Tr. 113)

"Q. Did your examination reveal this pattern of forgeries had existed for several years prior to the discovery in September, 1968?

A. As near as I could tell from the forgeries that were determined, the small FHA Title 1 forged notes, as they were determined to be, were the ones that remained at that point and they had some age on them. The larger activities, I would presume were of more recent origin.

Q. There forgeries had a pattern of snowballing; did they not? He started small and built up. He was replacing forged notes with new forged notes; was that not the pattern?

A. To some degree.

Q. And it had a cumulative effect; was that the pattern?

A. I believe so. When we determined the extent of forgeries and so forth, we were interested in the present moment only. The rest of it is just an added comment as far as we're concerned."

25. The Court has carefully reviewed and studied United States Fidelity and Guaranty Company's Exhibit 1, Discount Register for the year 1967, beginning with June 28, 1967; Exhibit 2, discount Register for the year 1965, beginning with June 21, 1965; Exhibit 3, Discount Register for the year 1963, beginning with July 2, 1963; Exhibit 4, Discount Register for the year 1961, beginning with May 22, 1961.

The Court finds that it was the policy of The Bank to register each and every loan that was made by an officer of The Bank; that Discount Register referred to the name of the drawer or maker and other items as follows: Drawee or Endorser; When Due; Amount; Discount.

The Court finds from a careful review of such Exhibits that each officer making a loan would cause the loan to be written in the Discount Register for the sole purpose of giving the note a number; that it was the responsibility of the officer making the loan to see that the interest was paid and that the note was paid when due; that the large out of territory loans were made only by James W. Boone, and these notes were either renewed or paid before the due date; that James W. Boone saw to it that each illegal, dishonest and fraudulent loan made by him would never come to the attention of the other officers and directors of The Bank nor to the attention of the bank examiners; that he knew that by keeping such loans current they would not create suspicion among the other officers and directors, and thus this became a part of his scheme to defraud, mislead and violate the trust that the other officers and directors of The Bank had so placed in him.

The Court has carefully examined USF&G's Exhibit 1 (Discount Register) which shows at page 200 the following three loans:

| Name | Due Date | Amount |
|------|----------|--------|
| Hayden Thompson | 1–15–67 | $22,000.00 |
| Robert A. Mitchell | 1–15–67 | $23,000.00 |
| Nordam, Inc. | 1–1–67 | $30,000.00 |

The Discount Register at page 1450 shows that when the first two notes came due, they were renewed by another loan, but with $1,000.00 added to each,

making them respectively loans in the sum of $23,000.00 and $24,000.00. There is no way to determine when the third loan (Nordam, Inc.) was paid, but it is clear that it was paid before the due date.

The Court finds that the officers and directors of The Bank had enormous respect for the examinations made by the FDIC, the State Bank Examiners and the certified public accountants, and based upon all of these examinations, all of the officers and directors were deceived by the skillfulness of James W. Boone in carrying out his kiting practice.

26. The Court finds that the complaints and recommendations stated in the annual "Reports of Examination" made by the FDIC and the State Bank Examiners were apparently complied with to the satisfaction of the FDIC and the Oklahoma Bank Commissioner because there was no action to require more compliance than that performed by president James W. Boone.

27. The Court finds that all of the living officers and directors of The Bank had absolute confidence and faith in the honesty and integrity of James W. Boone and never at any time suspected, or had reason to suspect dishonesty or want of fidelity in Mr. Boone; that they saw nothing and heard nothing that could or did put them, the FDIC or the Oklahoma Bank Commissioner on notice of fraudulent, dishonest and unlawful conduct.

28. The Court finds that the audit reports made by certified public accountants for the years 1963, 1965, 1966, 1967, and 1968 showed no illegal or unlawful conduct on the part of officers and directors in the management of The Bank, which audit reports were made available to the FDIC and the Oklahoma Bank Commissioner; that the officers and directors of The Bank relied upon these audit reports as did the FDIC and the Oklahoma Bank Commissioner, which they had a right to do.

29. The Court finds that James W. Boone was a "con artist" in that he was able to kite fictitious, forged and otherwise unlawful notes by never allowing the interest or principal on the notes to be delinquent or in default; that when one of the forged notes did become due, he would pay it by issuing another forged note which would be assigned to another bank without recourse; that the volume and amounts of the notes coming due had snowballed to the point that he no longer could skillfully keep his unlawful conduct secret.

30. The Court finds that James W. Boone realized in February, 1968, that he soon would be caught, thus, he wrote a note to his son (See Exhibit "C", page 28 herein) telling him how to pay certain notes out of his life insurance. Even then James W. Boone was contemplating taking his own life.

31. The Court finds from the acts, conduct and apparent grievance of James W. Boone after September 12, 1968, and his untimely death on September 17, 1968, that he did in effect confess with his life the responsibility of The Bank's failure and closing, and that had any of the officers or directors participated in any fraudulent or unlawful act with James W. Boone, there would have been some proof of the same, and there is no such proof or evidence whatsoever.

32. The Court finds that the loan officers, H. K. "Duke" Cook and John W. King, are now, and have been since The Bank closed in September, 1968, working in other banks in the high positions of loan officers. The responsibilities which they now have are the same responsibilities that they had in the closed bank. The work they are now performing is known to the FDIC and the Oklahoma Bank Commissioner, and neither make any complaint or have made any charges regarding the competency of the officers.

33. The Court finds from the evidence that all banking businesses must

operate on faith, trust and confidence in the honesty and integrity of fellow officers and directors, and to rely on this honesty and integrity is proper and is the usual practice until dishonest, unlawful and deceitful acts become obvious to the ordinary prudent bank officer or director.

34. As a direct and proximate result of his breach of duty, and violation of the laws, James W. Boone, by his illegal and wrongful acts, after allowing all off-sets and credits, is liable to the plaintiff, FDIC, in the sum of $231,607.17 and to third party plaintiff, USF&G, in the sum of $209,959.33. The liability and causes of action against R. R. Boone, Administrator of the Estate of James W. Boone, deceased, is and are causes of action which survive the death of James W. Boone. Plaintiff, FDIC, is entitled to judgment against R. R. Boone, Administrator of the Estate of James W. Boone, deceased, in the sum of $231,607.17, and third party plaintiff, USF&G, is entitled to judgment against said Administrator in the sum of $209,959.33.

### Conclusions of Law

1. Under Oklahoma law in order to render bank directors liable for losses because of illegal, fraudulent and wrongful acts of its president, such directors must participate therein or must be chargeable with negligently permitting the violation of the laws resulting in such losses.

2. Bank directors are not insurers for losses which were not caused by their fault or neglect of duty.

3. The directors of a state bank are not liable for losses resulting from or brought about by illegal and improper loans of bank funds by its long-time and respected president. Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662; Hoehn v. Crews (C.A. 10 Okla.) 144 F.2d 665, affirmed; Garber v. Crews, 324 U.S. 200, 65 S.Ct. 600, 89 L. Ed. 870.

4. Title 6 § 712 of the 1965 Banking Code of Oklahoma provides:

"A. Liability for violation of bank and trust laws. Any director, officer or other person who shall participate in any violation of the laws of this state, relative to banks and banking and trust companies, shall be liable for all damages which the corporation, its stockholders, depositors, creditors or owners of trust funds shall sustain in consequence of such violation, and the directors of any bank shall be individually liable for any loan made in excess of the amounts prescribed in Article XIII of this Code and shall be required to eliminate the same from the assets of the bank upon the request of the Commissioner."

5. Where there is a lack of credible evidence tending to prove that the directors of a state bank had knowledge of the president's forgeries and misdeeds and where the evidence further shows nothing to excite their suspicion or distrust of the president, they cannot be held liable for such misdeeds.

6. The directors of a state bank are charged only with neglect of their duties and are not liable for errors of judgment, nor are they liable for losses resulting from defalcations or mismanagement by the bank's president upon whom the directors mistakenly relied, and this is especially true where the directors did not and could not, in the exercise of ordinary care, learn of matters that would excite their suspicion to distrust the president.

7. Under the common law applicable in Oklahoma, bank directors can be held liable only for their failure to exercise ordinary care and diligence in conducting the affairs of the bank.

8. Where the president of a state bank forges notes and endorses such forged notes to another bank without recourse, so that such forged notes would not be shown in the notecase of the bank for examination by the directors and other officers of the bank, the directors cannot be held liable for such misdeeds

unless there is some evidence to show that their suspicions should have been aroused. These forged notes, when they became due, would be paid by the president with the issuance of another forged note which in turn was assigned to another bank without recourse. This system of kiting forged notes by the president was continued for an unknown period of time and up to the time of the closing of The Bank by the State Bank Commissioner.

9. The Bank had periodic examinations made by certified public accountants showing the condition of The Bank, which did not reveal or show any dishonest conduct on the part of the Bank's president, and the living defendant officers and directors should not be held liable for such dishonest conduct. This is especially so where The Bank was also periodically examined by the State Bank Examiners and by the examiners for the FDIC, none of which examinations revealed any dishonest conduct by the president and nothing to raise suspicion of the Board of Directors.

10. In determining the duties of bank directors, the custom and usage of similar banks is proper to be considered by the trier of the facts. Neese v. Brown, Tenn., 405 S.W.2d 577, 25 A.L.R.3rd 932 at 937.

11. Where directors of a state bank met regularly each month, at which meetings the president purportedly revealed to the directors and discussed with them all of the loans made during the previous month, they are not liable for the forgeries and other misconduct of the president which were not revealed to them and where they had no cause to suspect his dishonesty.

12. It was the duty of James W. Boone, now deceased, as the president, managing officer and director of The Bank at all times to act honestly, fairly and for the best interest of The Bank, and to inform and advise the bank examiners and directors of The Bank of all matters within his knowledge relating to the business of The Bank, whether favorable or unfavorable, and this he did not do.

13. It was the duty of president Boone to cause the books and records of The Bank to truly and correctly reflect its condition and the nature of all its transactions and not to conceal or hide any material matters affecting said bank.

14. The acts and misdeeds of James W. Boone, as president and managing officer of The Bank, was the immediate and proximate cause of The Bank's losses.

15. None of The Bank's losses resulted from any negligence, misconduct or inattention on the part of any of the directors except James W. Boone.

16. Bank directors not participating in forgeries and frauds of the bank president, or knowing of them, were not negligent in being deceived by the chief executive officer of the bank. Bank directors who are not themselves expert bankers, but who use their best judgment and skill in the interest of the bank where it appears that they were deceived by the adroit manipulation and fraudulent schemes of the president, and they are not responsible for losses resulting from the wrongful acts of the president, where it appears that they exercised ordinary care in the discharge of their duties.

17. To render directors or officers of a corporation liable to it for fraudulent or wrongful acts of other officers, they must have participated therein, or else they must be chargeable with culpable negligence. Briggs v. Spaulding, *supra*.

18. The president of a bank, although selected by the directors, is not the agent or servant of the directors, but of the corporation. Devlin v. Moore, 64 Or. 433, 130 P. 35 at 46.

Judgment will be entered accordingly.